337 P.2d 720

Vada J. Tomlinson ACOTT, Reba Tomlinson Fuller, Ruby Tomlinson Beebe, Nora E. Tomlinson Schockley, Marguerite Tomlinson Cisney and Alton E. Tomlinson, Plaintiffs and Respondents,

v.

Leslie A. TOMLINSON, individually and as Administrator of the Estate of A. L. Tomlinson, Deceased, Defendant and Appellant.

No. 8879.

Supreme Court of Utah.

April 6, 1959.

Fred H. Evans, Salt Lake City, for appellant.

Stephens, Brayton & Lowe, Thomas C. Cuthbert, Salt Lake City, for respondents.

CROCKETT, Chief Justice.

Plaintiffs are six adult children of A. L. Tomlinson. They sued their brother, Leslie A. Tomlinson, to have a trust imposed upon certain mining property derived from their father's estate, which they had quitclaimed to him, and for an accounting of proceeds. The trial court rendered judgment for plaintiffs and defendant appeals.

The fundamental problem is whether the evidence will support the determination of trust. Or conversely, to apply the rule of review in equity cases: does the evidence "clearly preponderate against the finding of the trial court" so that we would reverse such finding.[1]

The paterfamilias, A. L. Tomlinson, who died in 1941, claimed ownership of 14 unpatented mining claims in the Temple Mountain district of Emery County known as the Camp Bird claims. In July, 1942, probate proceedings were commenced in his estate by one Alvin Wallace who was appointed administrator. Nothing of consequence happened relative to these claims until 1949, when the uranium boom was under way. This increased interest in the property as a potential uranium source. In April of that year Wallace resigned as administrator and defendant was appointed. He took over and began shipping ore from the Camp Bird claims, and in 1949 leased some of them out. Royalties of $13,603.64 accrued under the lease. Of this he collected $7,329.71 and deposited it to the estate's account.

Shortly prior to the events just mentioned, interests we refer to as the Hanson group had started a quiet title action against all claiming in the Temple Mountain district, including defendant as administrator for the 14 Camp Bird claims. In December, 1951, the parties settled their rights by stipulation, giving defendant as administrator an undivided 3.53% interest in all claims in the whole Temple Mountain district. It was also agreed to disburse royalties held in escrow during the litigation, and all parties waived any claims against the others for ores extracted up to that time. Pursuant to this agreement defendant received the first distribution of the escrowed funds.

In January, 1950, before the entering into of the above mentioned agreement and while the title picture was still unsettled, defendant had been contacted by one E. G. Frawley who wanted to obtain the Camp Bird claims for Continental Mining and Milling Company, a corporation seeking uranium. To acquire the claims Frawley contracted with defendant to give $25,000 and 65,000 shares of Continental's common stock; to pay all expenses both in connection with the Tomlinson estate, and any necessary to clear title to the Camp Bird claims. For the purpose of facilitating the dealings with Frawley, defendant agreed to obtain quitclaim deeds from the other heirs.

Defendant wrote letters to his mother and each of the plaintiffs in January, 1950, explaining the above facts and asking for the quitclaim deeds. The letters expressly stated that the claims would be held for the plaintiffs' benefit, and that he

1. Nokes v. Continental Mining & Milling Co., 6 Utah 2d 177, 308 P.2d 954.

would account for all money and stock received therefrom. The plaintiffs complied with his request and signed the quitclaims to him. Shortly thereafter Frawley assigned the contract to Continental and the latter assumed all obligations thereunder.

In the spring of 1950, just after these transactions had taken place, Frawley and Continental apparently got the idea that defendant had misrepresented the quality of the Tomlinson estate's title to the Camp Bird claims and commenced suit to rescind the contract. By making some minor concessions defendant was able to retain the major undertakings by Continental. It would pay the same amount of money and shares of stock; the estate's legal expenses; and further would save defendant harmless from any claims arising out of ores removed from the Camp Bird claims prior to May 16, 1950; and the suit was dropped.

On December 19, 1950, Continental authorized the issuance to defendant of 32,500 shares of its stock. At the same time, defendant executed a document agreeing to take only a 5% interest in all the Temple Mountain district claims for which he relinquished any interest in the Camp Bird claims. One year later, as is outlined above, the claimed 5% interest was reduced to 3.53% by the stipulation entered into in the quiet title action brought by the Hanson group.

This is the factual setting in which defendant sent to his mother the seven quitclaim deeds which she and the six plaintiffs signed, and the effect of which is the kernel of this controversy. The defendant's justification for claiming the property for himself and excluding the plaintiffs therefrom proceeds thus: he avers that plaintiffs were so anxious to get royalties that they were willing to turn the claims over to him to get distribution; and that he accelerated distribution of royalties by personally assuming the risk that in the event of an adverse determination of the pending law suit the royalties might have to be returned. In support of that contention he emphasizes the fact that he distributed $500 to each of them near the time these deeds were made.

Plaintiffs' position is that they trusted their brother in accordance with his promises to manage the property for the benefit of all and assumed he was doing so, but they had no current knowledge of his dealings with Continental and his receipt of royalties and stock. They point out that they had already in 1950 quitclaimed to him their interests in the Camp Bird claims and were therefore not apprehensive about doing the same as to their interests in the whole Temple Mountain district for which the claims had been exchanged.

In regard to defendant's claim of assuming personal risk to accelerate royalty payments to the plaintiffs as consideration

for the deeds, the plaintiffs rejoin that the stipulation entered into held all parties, including the defendant, harmless for ores extracted prior to that time; and further, that the evidence shows that these royalty payments were forthcoming to the plaintiffs, and that the defendant paid himself a like amount at that time. There is also other evidence supporting plaintiffs' position: that even after he had received the 1952 deeds which he claims vested him with full ownership of the Tomlinson interests in the property, he still noted in his bank statement that he was depositing "royalty to estate" in one instance, and on two other occasions thereafter acknowledged that he was holding money for the estate. His sister, plaintiff Marguerite Cisney, testified that the defendant told her that if anything was realized on the claims it would be distributed to all of the heirs equally, which information she relayed to the other plaintiffs and thereafter they signed and returned the deeds to him.

■ From the summary of facts just stated there is ample basis for the determination made by the trial court that the defendant agreed to hold the property under an express trust; or alternatively, that the transaction was so unfair and lacking in disclosure of material facts to plaintiffs to require the imposition of a constructive trust on the property for their benefit.

Defendant advances three other arguments which may be treated summarily:

■ The first is that a trust cannot be imposed upon the interests in the Temple Mountain district, nor upon the stock acquired from Continental, because it was not part of the estate at the time the trust was created. The answer to this is that the court found that such properties all derived from the estate's interest in the Camp Bird claims. A trustee is chargeable with responsibility for the res of the trust and any increase therein, as well as for any property or proceeds into which it is transformed and which supplant it.[2] Otherwise trustees could engage in machinations by disposing of transferring or trading assets and render beneficiaries remediless.

■ Defendant's next argument is that inasmuch as the plaintiffs deeded the property to him and let him deal with it as his own without asserting their demands for several years, they are guilty of laches and barred from equitable relief. The gist of his contention is that the plaintiffs trusted him when they should not have done so. It does not lie in his mouth to thus claim advantage of his own wrong and reap a reward for deception. The very essence of trust is that confidence

2. 2 Scott on Trusts 203 (2d Ed.1956).

may be reposed in the trustee. Contributory negligence or even stupidity on the part of the beneficiary of a trust in not discovering his rights are being abused is not a basis for the application of laches.[3] Moreover, as we have recently stated, laches is even less applicable where a near relative is involved because of the greater likelihood of confidence being reposed in him.[4] That defense is only available against a beneficiary who knows, or the circumstances are such that he must be charged with knowledge, of the trustee's breach, or of his repudiation of the trust, and who so long delays in bringing suit that it would be inequitable to hold the trustee.[5]

Plaintiffs have cross-appealed alleging errors relating to certain items in the accounting by defendant under the trust imposed upon him:

The first is that of $13,603.64 accrued under the 1949–50 leases; defendant collected only $7,329.71, leaving $6,273.93 uncollected; another is in crediting him with $725 he admittedly spent for attorney's fees in connection with the estate when Continental had agreed to pay such expenses.

The applicable rule is that a trustee has a duty to use reasonable prudence and diligence in conserving and protecting all assets of the estate and to realize on claims in its favor if possible; and if he fails to do so he is subject to charge for any resulting loss.[6] Plaintiffs urge that defendant did not show that he had performed that duty in attempting to collect the full royalties that had accrued, nor in insisting that Continental pay the attorney's fee as it had agreed. In support of their contention they point to the fact that the findings recite that defendant had not made efforts in that regard, yet the trial court refused to enter judgment for plaintiffs on these items.

It is to be remembered that the burden of persuasion on these matters was upon the plaintiffs. The trial court was not obliged to adopt their view unless all reasonable minds would so believe from the evidence. It is also of importance to keep in mind that at the time in question the defendant seems to have been acting under the impression that the claims belonged to him and that the plaintiffs left to him the entire responsibility for the property. From this the trial court undoubtedly thought it fair to assume that he did everything he reasonably could to protect his own interests and that it would be unjust to impose upon him the duty to be any more efficient or shrewd in the management

3.  2 Scott, Trusts 219 (2d Ed.1956).
4.  Child v. Child, 8 Utah 2d 261, 332 P.2d 981.
5.  2 Scott, Trusts 219.2 (2d Ed.1956).
6.  2 Scott, Trusts 177 (2d Ed.1956).

of the claims for the plaintiffs than he was for himself. It is undoubted that the defendant did not collect the additional money, and that he in fact paid the attorney's fee. The court refused to charge him with deficiencies in the absence of any showing of misdealings or bad faith. We see no reason to disagree with this view. Nor are we disposed to regard the evidence as compelling a finding that the plaintiffs suffered damages by reason of the defendant's conduct with respect to these two items of account.

Plaintiffs also complain of the failure to charge the defendant with $6,560.23 profit he personally made under a lease of mining claims in that district from Continental in 1950. After the claims had been transferred to that company, defendant took a sublease from it of Camp Bird Claim No. 12. From it he produced ore grossing $23,804.40, had expenses of $17,244.17, leaving a net of $6,560.23. The argument is that this was self-dealing by the defendant and that any sublease he took should have been for the estate.

It is, of course, true that a trustee is accountable for any profit made in the administration of the trust; and a fortiori, for any profit made through a breach of trust.[7] The evidence here is susceptible of a reasonable view which would justify the trial court in refusing to consider the transaction as a dealing with the trust estate. When Continental took these claims from Frawley, who received them under contract with the defendant, the defendant and the estate lost any specific interest in these particular claims. They were subject to operation and control by Continental, which was free to deal with the claims so long as the royalties were paid to the estate. The defendant, upon his personal initiative and by his own effort and energy, engaged in this mining venture, and there is no indication that his connection with the estate had anything to do with the transaction. The royalties paid and the final income to the estate for the removal of ores was the same as if any disinterested third party had mined the claim. Under the strictest view of trust responsibility, the rule prohibiting a trustee from dealing for profit with the trust property, the ruling of the trial court may seem questionable. However, the burden of persuasion was on plaintiffs. Inasmuch as the trial judge with his advantages in resolving questions of fact and determining equities refused to find that the defendant in this particular violated his fiduciary duties to the damage of the beneficiaries, we will not disturb his determination in that regard.

7. 2 Scott, Trusts 203 (2d Ed.1956).

The final error charged is in the trial court's award to the plaintiffs of only 1⅖₁sts share in the trust property and accounting. Plaintiffs contend that the defendant agreed to hold the property in trust for the eight heirs equally, including himself and his mother; and thus the six plaintiffs should have ⁶⁄₈ths or ¾ths thereof. The trial judge first deducted ⅓, or ⁷⁄₂₁sts as the widow's share, then ²⁄₂₁sts for the defendant and allowed the plaintiffs their 1⅖₁sts as their share of the trust estate. Notwithstanding plaintiffs' evidence that the heirs, including the mother, when they shared in the proceeds did so in equal shares, the evidence is not so clear and persuasive as to make mandatory a finding that such was the agreement between them. Furthermore, the mother is not a party to this suit. The effect of the plaintiffs' contention is that the court should adjudicate her rights, depriving her of her full widow's statutory share in the property, in a suit to which she is not a party, which the trial court properly refused to do.

Affirmed. Costs to respondents (plaintiffs).

WADE, HENRIOD, and McDONOUGH, JJ., concur.

WORTHEN, J., concurs in result.