**Ronald R. ROTERT, Respondent,**

v.

**Charles E. FAULKNER and Alice M. Faulkner, Appellants.**

### No. 12985.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 31, 1983.

John Z. Williams, Williams, Smallwood & Crump, Rolla, for appellants.

W.H. Thomas, Jr., Ralph J. Haslag, Routh, Thomas & Birdsong, P.C., Rolla, for respondent.

CROW, Judge.

Charles E. Faulkner and Alice M. Faulkner, makers of a promissory note, appeal from a judgment against them for the full amount of the note. They argue that, as a matter of law, they owe only half the balance due. The facts are undisputed.

The Faulkners signed the note September 29, 1977. It was payable to the order of Elmer E. Miller and Ronald R. Rotert "as joint tenants and not as tenants in common." The principal amount was $25,000, "with interest thereon from the date of death of Elmer E. Miller" at the rate of eight percent per annum. Principal and interest were payable in monthly install-ments of $303.32 beginning one month after Miller's death.

The note provided that if there were default in the payment of any installment and said installment remained overdue and unpaid, then both principal and interest would become immediately due and payable at the option of the holder. The note further provided that in case payment was not made at maturity and the note was placed in the hands of an attorney at law for collection, the makers agreed to pay the costs of collection, including a reasonable attorney's fee.

The note was delivered to Miller.

On July 12, 1978, Miller wrote the following on the note:

> "July 12, 1978
> Paid In Full
> for Services Rendered
> Elmer E. Miller"

Miller also wrote "Paid" across the face of the note and, on the same day (July 12, 1978), returned the note to Charles E. Faulkner, who kept it thereafter.

Miller died December 29, 1979.

The Faulkners paid nothing to Miller or Rotert during Miller's lifetime.[1] After Miller's death, the Faulkners paid nothing to Rotert.

Rotert employed a firm of attorneys at law to collect the note. Suit was filed July 10, 1981.

The cause was tried without a jury. At trial, all parties treated the note as having been initially owned by Miller and Rotert as joint tenants with right of survivorship. Rotert contended that, as surviving joint tenant, he was entitled to be paid the full amount of the note. The Faulkners conceded that Rotert was entitled to half the balance due, but contended that Miller's acts of July 12, 1978, had the effect of (a) severing the joint tenancy, thereby making Miller and Rotert tenants in common, and

---

1. No payment was due, of course, while Miller was alive.

(b) assigning Miller's interest in the note—said by the Faulkners to be one-half—to them. The Faulkners thus denied liability for half the debt.

The trial court, relying on § 400.3–116, RSMo 1969,[2] held that Miller's unilateral attempt to discharge the note was a nullity, and of no force and effect. § 400.3–116 provides, in pertinent part:

"An instrument payable to the order of two or more persons

. . . .

(b) if not in the alternative is payable to all of them and may be negotiated, discharged or enforced only by all of them."

With respect to the Faulkners' contention that Miller's attempted discharge transferred a half interest in the note to them, the trial court concluded that (a) Miller and Rotert held the note as joint tenants, (b) Miller's attempted discharge, being a nullity under § 400.3–116, did not sever the joint tenancy, (c) after Miller's attempted discharge, the Faulkners could, at most, arguably be deemed to equitably hold whatever interest Miller had in the note, (d) the Faulkners took no action, by partition or otherwise, to sever any interest they held in the note before Miller died, (e) Miller's death extinguished that interest, and (f) Rotert, as surviving joint tenant, was entitled to recover in full.

The trial court entered judgment for Rotert against the Faulkners for $25,000, together with interest at the specified rate from the date of Miller's death, an attorneys' fee of $3,500, expenses of $53.15, and costs.

On appeal, as below, the Faulkners admit liability for half the balance due on the note, but deny liability for the other half. They do not challenge the attorneys' fee or expenses.

We begin our analysis by holding § 400.-3–116, on which the trial court relied, inapplicable.

§ 400.3–116 is part of Article 3 of the Uniform Commercial Code ("UCC"). The UCC was adopted in Missouri effective July 1, 1965. Laws 1963, p. 637, Sec. 10–101.

In Article 3 of the UCC (and therefore § 400.3–116) the term "instrument" means a negotiable instrument. § 400.3–102(1)(e).

A writing, to be a negotiable instrument within Article 3 of the UCC, must, among other things, be payable on demand or at a definite time. § 400.3–104(1)(c). The note here is not payable on demand; thus, if it is to be a negotiable instrument, it can be so only if it be payable at a definite time.

§ 400.3–109(1) provides, in pertinent part, that an instrument "is payable at a definite time if by its terms it is payable . . . (d) . . . automatically upon or after a specific act or event."

§ 400.3–109(2) provides that an instrument which by its terms is otherwise payable only upon an act or event uncertain as to time of occurrence is not payable at a definite time even though the act or event has occurred.

These UCC provisions as to definiteness of time of payment differ from the statutory provisions that dealt with that subject prior to July 1, 1965.

One of the prior statutes, § 401.001(3), RSMo 1959, provided that an instrument, to be negotiable, must be payable on demand or at a fixed or determinable future time. Another, § 401.004.1(3), RSMo 1959, provided that an instrument was payable at a determinable future time if payable on or at a fixed period after the occurrence of a specified event which was certain to happen, though the time of happening be uncertain. The two sections just cited were part of chapter 401, RSMo 1959, the Negotiable Instruments Law ("NIL"), repealed ef-

---

**2.** The 1969 revision of RSMo was in effect at the time of Miller's acts of July 12, 1978. § 400.3–116 was carried forward unchanged in RSMo 1978, as were the other sections of chapter 400, RSMo 1969, to which we hereafter refer. For brevity, we henceforth omit "RSMo 1969" when referring to statutes in the 1969 revision. All references beginning with "§" are to the 1969 revision, unless otherwise indicated.

fective July 1, 1965.[3]  Cases under the NIL recognized that because death was inevitable, an instrument payable at, or at a fixed period after, a person's death was payable at a determinable future time, thus satisfying that requirement for negotiability. *Smith v. Lentini,* 125 Vt. 526, 220 A.2d 291 (1966); *Murrell v. Gibbs' Adm'r,* 275 Ky. 124, 120 S.W.2d 1018 (1938).  10 C.J.S. Bills and Notes § 97 (1938).

That principle, however, no longer pertains.  The Missouri Code Comment under § 400.3–109 (the "definite time" provision of the UCC) explains that the NIL rule was changed by the UCC.  The Comment states:

> "It [the NIL rule] provided that an instrument payable at a fixed time after an occurrence certain to happen but with the time of happening uncertain was negotiable.  Since notes of this type are not common in commercial usage and need not be negotiable, this rule is abolished."

The Missouri Code Comment is followed by the Uniform Commercial Code Comment.  Paragraph 1 of the latter refers specifically to post-obituary notes, along with others payable upon or at a fixed period after similar uncertain dates.  Observing that such notes are likely to be made under unusual circumstances suggesting good reason for preserving defenses of the maker, the Comment states such notes are, accordingly, eliminated.

Commentators agree that an instrument payable on or after death is not negotiable under the UCC because the time of payment is uncertain.  2 Anderson, Uniform Commercial Code § 3–109:9 (2d ed. 1971); Bender's U.C.C. Service, Hart & Willier, Commercial Paper § 2.13[3] (1983).  *Succes-*

*sion of Vidrine,* 377 So.2d 564, 566 (La.App. 1979), is in accord, taking specific notice of the difference in treatment of such instruments between the NIL and the UCC.

Inasmuch as the first payment on the note here was due one month after Miller's death, the note was not payable at a definite time within the meaning of Article 3 of the UCC.  The note, therefore, is not a negotiable instrument.

But for one exception not material here, Article 3 of the UCC (and therefore § 400.-3–116) applies only to negotiable instruments.  § 400.3–805.[4]  Consequently, because the note here is not a negotiable instrument, the legal effect of Miller's acts of July 12, 1978, is not to be determined by § 400.3–116, or by any other statute that applies exclusively to negotiable instruments.

This does not mean, however, that ownership of the instant note cannot be transferred.  It means only that the transfer cannot amount to a "negotiation," a particular type of transfer in which the transferee becomes a holder, § 400.3–202(1), and, by reason thereof, acquires certain specific rights in the instrument, § 400.3–301.[5]

The NIL, during the time it was in effect, did not prescribe an exclusive method of transferring negotiable instruments, but only the manner in which their independence of equities could be preserved.  *Butler v. Kopplin,* 253 S.W.2d 514, 516[1] (Mo.App. 1952).  Regardless of the NIL, a note could still be transferred by assignment, or by mere delivery without indorsement, save only that in such case the transferee took

---

**3.**  Laws 1963, p. 637, Sec. 10–102.  The NIL was adopted in Missouri effective June 16, 1905.  Laws 1905, p. 243.

**4.**  § 400.3–805 provides: "This article [Article 3] applies to any instrument whose terms do not preclude transfer and which is otherwise negotiable within this article but which is not payable to order or to bearer, except that there can be no holder in due course of such an instrument."  The Uniform Commercial Code Comment under this section explains that it refers to a particular type of instrument which meets all requirements as to form of a negotia-

ble instrument except that it is not payable to order or to bearer.  The typical example is a check reading merely "Pay John Doe."  The note in the instant case is not "otherwise negotiable" within Article 3 because, as already explained, it is not payable on demand or at a definite time.

**5.**  If the holder takes the instrument under conditions that constitute him a holder in due course, § 400.3–302, he takes the instrument free from certain claims and defenses that would otherwise accompany it, § 400.3–305.

the note subject to all the defenses and equities to which it was subject in the hands of the transferor. *Id.*

The UCC, as did the NIL, recognizes that negotiation is not the only method of transferring a negotiable instrument. One can be transferred by assignment, and if transferred in that manner, Article 3 of the UCC generally has little application to the transfer. Bender's U.C.C. Service, Hart & Willier, Commercial Paper § 3.01[2] (1983). Indeed, Article 3 of the UCC specifically recognizes that if a negotiable instrument is indorsed in a certain way, the indorsement operates only as a partial assignment. § 400.3–202(3).

■ Instruments that are not negotiable, such as the note here, may, like negotiable instruments, be transferred by assignment. *Kaw Valley State Bank & Trust v. Commercial Bank of Liberty,* 567 S.W.2d 710 (Mo.App.1978). The assignee of a note that is not negotiable, however, takes it subject to all defenses the maker may have against the note prior to notice of the assignment. *Id.* at 713[7].

Having set these items in place, our next task is to more precisely identify the character of the note here.

■ It is, of course, a written promise to pay money.[6] Because it is signed by the Faulkners and payable to the order of Miller and Rotert, and is for a specific sum, it imports a consideration. § 431.020 [7]; *Burrell v. Kaiser's Estate,* 344 S.W.2d 622 (Mo. App.1961). One of the consequences of such an instrument is that, even though not negotiable, a person suing on it is not required to prove consideration. *Id.; Lowrey v. Danforth,* 95 Mo.App. 441, 69 S.W. 39 (1902). Failure of consideration is an affirmative defense, and the burden of proof is on the maker. *Burrell,* 344 S.W.2d at 629; *Gershon v. Ashkanazie,* 199 S.W.2d 38, 46 (Mo.App.1946). Because the instrument here possesses these attributes, we may properly call it a note, even though it lacks the quality of negotiability. *Finney v. Shirley,* 7 Mo. 42 (1841); 11 Am.Jur.2d, Bills and Notes § 21 (1963).[8]

■ In addition to the attributes above, the instant note is susceptible to joint ownership. In *Longacre v. Knowles,* 333 S.W.2d 67 (Mo.1960), a promissory note was payable "to the order of Gus Longacre and/or Joe N. Longacre, as joint tenants with right of survivorship." Gus died, survived by Joe. Joe was held to be sole owner of the note. *Longacre* states that although the term "joint tenancy" properly refers to an interest in land, Missouri recognizes that any personal property subject to being possessed in severalty is subject to joint ownership. *Id.* at 69[1]. *Longacre* clearly and succinctly explains the four unities required for a joint tenancy (possession, interest, title and time), *id.,* at 69, 70, and we need not repeat the explanation.

Here, the trial court agreed with the parties that the note, at inception, was owned by Miller and Rotert as joint tenants with right of survivorship.[9] Accordingly, the next item for our consideration is what

---

6. The note begins: "FOR VALUE RECEIVED, we, or either of us, promise to pay . . . ."

7. § 431.020, which antedates the UCC and is not part thereof, provides:

   "All instruments of writing made and signed by any person or his agent, whereby he shall promise to pay to any other, or his order, or unto bearer, any sum of money or property therein mentioned, shall import a consideration, and be due and payable as therein specified."

8. Article 3 of the UCC recognizes that the term "note," as used in other articles of the UCC, may refer to instruments that are not negotiable within Article 3. § 400.3–104(3).

9. A provocative issue, not raised below, is whether Miller and Rotert had unity of interest in the note, one of the elements required for joint tenancy. *Longacre,* 333 S.W.2d at 69, 70. Because the first payment was not due until a month after Miller's death, Miller, even had he become sole owner of the note (as surviving joint tenant or otherwise), would have never been entitled to collect anything. Miller's interest thus appears to be substantially different than Rotert's. We decline, however, to explore the subject *sua sponte.* The result we reach, infra, would be the same had Miller and Rotert owned the note as tenants in common.

effect, if any, Miller's acts of July 12, 1978, had on the joint tenancy.

Neither side cites a case on what is necessary to sever a joint tenancy in a note in Missouri, and we find none. We are mindful, however, that when Missouri real estate is held by two persons in joint tenancy, the tenancy is severed if one of the tenants conveys his interest to a third person. *McClendon v. Johnson*, 337 S.W.2d 77, 82 (Mo.1960). When this occurs, the right of survivorship is lost, and the former co-tenant and the third person become tenants in common. *Id.* This is the common law rule, whether the property be real or personal. 48A C.J.S. Joint Tenancy § 17 (1981); 20 Am.Jur.2d, Cotenancy and Joint Ownership § 16 (1965). We see no reason why the rule should not apply to the note here. Accordingly, we hold that if Miller, by his acts of July 12, 1978, effectively transferred his interest in the note to the Faulkners, the joint tenancy between Miller and Rotert was severed and the right of survivorship was extinguished.

We have already seen in *Kaw Valley State Bank & Trust*, 567 S.W.2d 710, that the owner of a note that is not negotiable may transfer his interest therein by assignment. An earlier case, *Sauter v. Leveridge*, 103 Mo. 615, 15 S.W. 981 (1891), reached the same result. There, the owner-payee of two notes that were past maturity, and thus no longer negotiable, assigned the notes to another. The assignment was by separate instrument, the notes themselves being lost. Judgment for the assignee against the maker was affirmed. It is thus established in Missouri that even though a note does not possess the quality of negotiability, its owner may nonetheless, by assignment, transfer his interest to another.

Any language, however informal, if it shows the intention of the owner of a chose in action[10] to transfer it, and sufficiently identifies the subject matter, is sufficient to vest the property therein in the assignee. *Greater Kansas City Baptist and Community Hospital Association, Inc. v. Businessmen's Assurance Co.*, 585 S.W.2d 118, 119[1] (Mo.App.1979); *Halvorson v. Commerce Trust Co.*, 222 S.W. 897, 898 (Mo.App.1920).

Here, it is obvious from what Miller wrote on the note on July 12, 1978, that he intended to divest himself of all rights in the note and to surrender those rights to the Faulkners, so that their liability on the note would be extinguished. Had Miller, alone, owned all right, title and interest in the note on July 12, 1978, the writing he placed thereon, coupled with his return of the note to Charles E. Faulkner, would have constituted a transfer to the Faulkners, by assignment, of all right, title and interest in the note.[11]

Miller, however, was only one of two owner-payees of the note on July 12, 1978. Accordingly, we must determine whether Miller had the power, alone, to assign his interest, whatever it was, to the Faulkners.

In *McLeod v. Snyder*, 110 Mo. 298, 19 S.W. 494 (1892), decided before advent of the NIL,[12] four notes were each made payable to two payees. One payee transferred his interest in two of the notes to parties who subsequently transferred that interest to the other originally named payee. In upholding the latter's right to sue, *McLeod* held that a debtor, if he chooses, may make his notes to as many persons as he pleases, and each one of the payees may transfer his interest therein to another person; otherwise each payee might have an unmarketable title on his hands. *McLeod* distinguished this rule from the one forbidding transfer by a payee of portions of his interest to another or different payee, and thus rendering the nonconsenting debtor liable

---

10. The term "chose in action" includes a right to receive or recover a debt, demand, or damages on a cause of action *ex contractu.* Black's Law Dictionary 305 (4th ed. 1951).

11. Had the note been negotiable, and thereby subject to § 400.3–605(1)(b), and had Miller, alone, owned the note, his act of surrendering

the note to Charles E. Faulkner would have discharged it. *Kinney v. Columbus Temperature Control Co.*, 2 Ohio App.3d 396, 442 N.E.2d 465 (1981).

12. Footnote 3, supra.

to a number of suits and to additional costs. *McLeod* recognized that a debtor can choose to contract that his debt be paid as integer or in fractions, and where he contracts in the latter way he cannot object if the payee or payees transfer such fraction or fractions to someone else. 19 S.W. at 495. This holding has never been disturbed.

Accordingly, we rule that Miller, at the time of his acts of July 12, 1978, had the power to assign his interest in the note, whatever that interest was, to the Faulkners. As we have already found that Miller's acts were sufficient for that purpose, our final task is to determine the extent of Miller's interest in the note on that date.[13]

There was no evidence about the respective interests of Miller and Rotert in the note.[14] In *Blue Valley Federal Savings and Loan Association v. Burrus,* 637 S.W.2d 737 (Mo.App.1982), which involved a joint tenancy in a savings account, it was held that the interests of joint tenants are presumed to be equal, although disproportionate contributions by one may be shown to establish a different interest. *Id.* at 743[5]. Absent proof by a party claiming the interests of joint tenants are unequal, the presumption of equal ownership will prevail. *Id.* at 744.

We apply the same principle here, and hold that inasmuch as there was no evidence that Miller's and Rotert's interests were disproportionate, each held an undivided one-half interest in the note prior to July 12, 1978. Miller's acts on that date transferred his half interest in the note to the Faulkners, thereby severing the joint tenancy and extinguishing the right of survivorship. Therefore, since July 12, 1978, Rotert has held only a half interest in the note.

As observed earlier, the Faulkners admit they owe Rotert half the balance due on the note, and they do not challenge the computation of interest, the attorney's fee, expenses or costs.

The judgment is reversed and the cause is remanded. The trial court is directed to enter judgment in favor of Rotert and against the Faulkners for $12,500, together with interest thereon from December 29, 1979, to September 27, 1982,[15] at the rate specified in the note, an attorney's fee of $3,500, expenses of $53.15, and costs, the aggregate to bear interest at nine percent per annum from September 27, 1982, until paid. § 408.040, RSMo 1978, as amended by Laws 1979, p. 580.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.

13. This treatment is the same as it would have been had the note been negotiable. In *Foremost Insurance Co. v. First City Savings & Loan Association,* 374 So.2d 840 (Miss.1979), a draft payable to two parties, not in the alternative, was paid on the genuine indorsement of one payee and the forged indorsement of the other. In a suit by the drawer against the institution that paid the draft, it was held that the draft was not negotiated because the indorsement of one payee was lacking. However, the institution that paid the draft was held to have acquired the rights of the payee whose indorsement was genuine. (Those rights turned out to be worthless because the other payee had a lien on the entire amount of the draft.) A similar rule was laid down in *State ex rel. Stevenson v. Hatch,* 41 Or.App. 609, 598 P.2d 1234, 1237[5] (1979). There, it was held that if one of two joint payees to a check transfers *his* interest to a third party, the transferee acquires only the interest of the transferor; the transferee holds a nonnegotia-ble chose in action. In *Skinner v. Mortgage Investments Co.,* 165 Colo. 241, 438 P.2d 504 (1968), it was held that failure by one of two joint payees to indorse a check destroyed negotiability. The transferee was held to have acquired, as assignee of a nonnegotiable chose in action, the interest of the payee who did indorse. The interest of the transferee in the proceeds of the check was for the court to determine.

14. Rotert's petition alleged the note was given by the Faulkners in payment for land conveyed to them by Miller and Rotert, who were "joint owners" of that land. The Faulkners' answer admitted the note was given for the land, but averred they (the Faulkners) were without knowledge or information as to ownership of the land by Miller and Rotert. The answer denied Rotert had an interest in the note prior to Miller's death.

15. Date of judgment in the trial court.