**In re Estate of Christine Cannon KNICKERBOCKER, Decedent.**

**Bradford E. KNICKERBOCKER, Plaintiff and Appellant,**

v.

**James Q. CANNON, Defendant and Appellee.**

**Anthony J. CANNON, Elaine A. Cannon, and James Q. Cannon, as Trustees of the Christine C. Knickerbocker Trust, and Anthony J. Cannon, as Special Administrator of the Estate of Christine C. Cannon Knickerbocker, Cross–Appellants,**

v.

**Bradford E. KNICKERBOCKER, Cross–Appellee.**

Nos. 940206, 940222.

Supreme Court of Utah.

Feb. 23, 1996.

---

Ralph D. Crockett, James E. Bugden, Salt Lake City, for plaintiff.

Steven H. Gunn, Gerald T. Snow, Salt Lake City, for the Cannons and the Estate.

HOWE, Justice:

This appeal is from a judgment entered in several consolidated actions involving the validity of a will, a revocable trust agreement, the severance of a joint tenancy in real estate, a change of beneficiary designation on a life insurance policy, ownership of a Thunderbird automobile, and a personal representative's conversion of household furnishings and an AMC Jeep.

Plaintiff Bradford E. Knickerbocker and Christine Cannon Knickerbocker married on July 2, 1984. During their marriage, they purchased a life insurance policy from MML Bay State Life Insurance Company on Mrs. Knickerbocker's life in the amount of $325,-000. The policy named Mrs. Knickerbocker as owner, Mr. Knickerbocker as primary beneficiary, and Mrs. Knickerbocker's two minor children from a previous marriage, Isaac and Abigail Jacobsen, as secondary beneficiaries. On July 22, 1991, Mrs. Knickerbocker filed a divorce action against her husband. The trial court awarded her exclusive temporary use of the house that she owned in joint tenancy with Mr. Knickerbocker and issued a temporary restraining order prohibiting him from contacting her. On August 7, 1991, the court issued another order prohibiting the parties from "selling, encumbering or mortgaging" their assets. Thereafter, Mr. Knickerbocker left the state and did not return to Utah until after Mrs. Knickerbocker's death on December 7, 1991. The divorce action was pending at that time.

About the time she filed for divorce, Mrs. Knickerbocker learned that she was suffering from a potentially life-threatening disease, diagnosed after her death as malignant intravascular lymphomatosis, a rare blood disease. As Mrs. Knickerbocker's condition worsened, she expressed concern about the welfare of her two children to her attorney, Joseph Henriod, her mother, cross-appellant Elaine Cannon, and her brother, defendant and cross-appellant James Q. Cannon.[1] In an effort to preserve her assets for her children, she decided to establish an inter vivos trust for their benefit, execute a will naming them as her beneficiaries, and appoint Mr. Cannon as her attorney-in-fact. On August 21, 1991, while she was a patient at the University of Utah Medical Center, she executed (1) a declaration of trust and agreement establishing a trust for the benefit of her children and naming herself, Anthony J. Cannon, and Elaine Cannon as trustees; (2) her last will and testament naming Mr. Cannon as the personal representative of her estate; and (3) a durable power of attorney naming Mr. Cannon as her attorney-in-fact.

A few days before executing these documents but after the trial court had prohibited Mr. and Mrs. Knickerbocker from "selling, encumbering or mortgaging" their assets, Mrs. Knickerbocker executed a quitclaim deed "as a Joint Tenant," conveying to herself "as a Tenant in Common" her interest in the house. The deed was promptly recorded. After establishing the trust, she executed a deed conveying her one-half interest in the house to the trustees. She also told Mr. Cannon that she wished to transfer all her other assets to the trust and name the trustees as the primary beneficiaries of any life insurance policy which she held. In accordance with this direction, Mr. Cannon, acting under a durable power of attorney, transferred her "right, title and interest" in personal property, shares of stock, mutual funds, and bank accounts to the trustees. In addition, on December 6, 1991, he executed three change-of-beneficiary documents and entrusted them to Mr. Henriod to send to Mrs. Knickerbocker's insurers. Mrs. Knickerbocker died the next day.

In the days following Mrs. Knickerbocker's death, Mr. Cannon took several steps which formed the basis for actions later filed against him by Mr. Knickerbocker. In reviewing Mrs. Knickerbocker's affairs, Mr. Cannon and Mr. Henriod discovered that MML Bay State Life Insurance Company was one of her insurers. Mr. Henriod sent the company one of the change-of-beneficiary documents which Mr. Cannon had signed the day before Mrs. Knickerbocker's death. The

---

1. James Q. Cannon will be referred to as Mr. Cannon throughout this opinion, and Anthony J.

Cannon, another cross-appellant, will be referred to by his full name.

company received the document on December 16, 1991. In keeping with Mrs. Knickerbocker's desire to leave her personal property for the benefit of the trust, Mr. Cannon arranged for the removal of the furnishings from the house. He kept them in storage until approximately nine months later when the trial court ordered them returned to the house. Mr. Cannon also sold an AMC Jeep which Mr. and Mrs. Knickerbocker had owned jointly and used the proceeds to pay funeral and legal expenses associated with the administration of Mrs. Knickerbocker's estate.

Mr. Cannon filed a petition for formal probate of Mrs. Knickerbocker's will and formal appointment of himself as personal representative of her estate. The petition was ultimately granted. Meanwhile, Mr. Knickerbocker filed actions against Mr. Cannon challenging the validity of the change-of-beneficiary document sent to MML Bay State Life, the durable power of attorney, the severance of the joint tenancy in the house, and the revocable trust agreement. He also sought damages for Mr. Cannon's conversion of the household furnishings and the Jeep. The court consolidated these actions, and Mr. Knickerbocker moved for partial summary judgment on the conversion and joint tenancy issues. The court granted this motion, holding that Mr. Cannon's removal of the household furnishings constituted conversion and ordered him to mitigate damages by returning them. The court also found that Mrs. Knickerbocker's attempt to sever the joint tenancy in the house was legally ineffective because (1) she did not effectively convey the property to a third party, and (2) it violated the August 7, 1991, order prohibiting the parties from "selling, encumbering or mortgaging" their assets.

After further discovery, the court held a jury trial. However, the jury was dismissed by stipulation after the second day, and the court issued findings of fact and conclusions of law disposing of all remaining issues. Relevant to this appeal, the court held that Mr. Cannon successfully changed the designation of beneficiary on Mrs. Knickerbocker's MML Bay State life insurance policy from Mr. Knickerbocker to Anthony J. and Elaine Cannon as trustees of Mrs. Knickerbocker's trust. The court also ordered Mr. Cannon to pay nominal damages in the amount of $2 to Mr. Knickerbocker for the conversion of the items of household furnishings in which he held an interest. Finally, the court ruled that upon Mrs. Knickerbocker's death, Mr. Knickerbocker became the sole owner of the Jeep by right of survivorship and that its sale by Mr. Cannon constituted conversion. Mr. Cannon was ordered to pay Mr. Knickerbocker damages in the amount for which the Jeep was sold.

Mr. Knickerbocker appeals, contending that the trial court erred in finding that Mr. Cannon effectively changed the designation of beneficiary. He also challenges the court's award of nominal damages for the conversion of the household furnishings, arguing that the proper measure of damages is the fair rental value of the furnishings. Finally, he contends that the amount of damages for the conversion of the Jeep should be measured by the blue book value, not by the amount for which it was sold.

Mr. Cannon, Anthony J. Cannon, and Elaine Cannon cross-appeal, asserting that the trial court erred in ruling that Mrs. Knickerbocker failed to sever the joint tenancy in the house. In their brief, they also contend that the court erred in ruling that Mr. Knickerbocker became the sole owner of the Jeep and a Thunderbird automobile at his wife's death. However, at oral argument, they conceded that this ruling was correct as to the Jeep pursuant to Utah Code Ann. § 75-6-201(4).

## I. THE JOINT TENANCY

Before examining Mr. Knickerbocker's assignments of error, we address cross-appellants' argument assailing the trial court's ruling that Mrs. Knickerbocker failed to sever the joint tenancy. This issue is most appropriately addressed in three parts. In the first part, we will determine whether Mrs. Knickerbocker's quitclaim deed from herself as joint tenant to herself as tenant in common was valid. Second, we will examine whether the deed violated the trial court's order in the divorce proceeding prohibiting the parties from "selling, encumbering or

mortgaging" their assets. Finally, we will determine whether Mrs. Knickerbocker's conveyance of her interest in the house to the trustees violated the order.

### A. The Unilateral Severance

■ Historically, a joint tenant could unilaterally terminate a joint tenancy by destroying one of the four unities essential to joint tenancy—time, title, interest, and possession. II *American Law of Property* § 6.2, at 8–9 (1952). A joint tenant could destroy the unities of title and interest by selling or mortgaging his interest to a third party. *Tracy–Collins Trust Co. v. Goeltz,* 5 Utah 2d 350, 356–57, 301 P.2d 1086, 1089–90 (1956). Alternatively, a joint tenant could arrange a "strawman" transaction, in which he would convey his interest to a third party who would immediately convey it back to the grantor. However, a joint tenant could not terminate a joint tenancy by executing a unilateral self-conveyance because such a conveyance had no legal effect and could not destroy any of the four unities. 4 *Thompson on Real Property* 48 (Davis A. Thomas ed., 1994).

This court followed the common law approach in *Nelson v. Davis,* 592 P.2d 594 (Utah 1979). In that case, the plaintiff, Douglas Nelson, filed for a divorce from his wife, Betty Nelson. In the course of the divorce proceeding, the trial court prohibited the parties from disposing of or encumbering their assets prior to the conclusion of the case. A few days later, Mrs. Nelson, who owned a house with Mr. Nelson in joint tenancy, deeded her interest in the house to the defendant, a daughter of a previous marriage. She also executed and recorded a document entitled "Notice of Termination of Joint Tenancy in the house." *Id.* at 596. Before the divorce proceeding was resolved, Mrs. Nelson died. We found the deed to the daughter invalid for lack of delivery and because it was executed in derogation of the trial court's restraining order. In the absence of a valid conveyance by deed, we held that the joint tenancy could not have been severed by Mrs. Nelson's "mere unilateral declaration of termination of such a tenancy." *Id.* at 596–97.

The instant case is clearly distinguishable on the facts since Mrs. Nelson's notice of termination of joint tenancy was a nonstatutory instrument, containing no words of grant, while Mrs. Knickerbocker severed the joint tenancy by means of a duly recorded quitclaim deed. Therefore, plaintiff erred in relying on our holding in *Nelson* for the broad proposition that in Utah, a joint tenancy cannot be unilaterally severed by one of the parties. Cross-appellants cite to a number of recent cases which have abolished the need to convey to a strawman in order to sever a joint tenancy and have recognized that a severance may be accomplished by a unilateral self-conveyance. *Riddle v. Harmon,* 102 Cal.App.3d 524, 162 Cal.Rptr. 530, 532 (1980); *Countrywide Funding Corp. v. Palmer,* 589 So.2d 994, 995–96 (Fla.Dist.Ct. App.1991); *Minonk State Bank v. Grassman,* 103 Ill.App.3d 1106, 59 Ill.Dec. 802, 803–04, 432 N.E.2d 386, 387–88 (1982), *aff'd,* 95 Ill.2d 392, 69 Ill.Dec. 387, 447 N.E.2d 822 (1983); *Hendrickson v. Minneapolis Fed. Sav. & Loan Ass'n,* 281 Minn. 462, 161 N.W.2d 688, 691–92 (1968). In addition, they point out that the California and Illinois cases which this court relied on in *Nelson v. Davis* to support its holding that joint tenants cannot unilaterally sever joint tenancies, *Clark v. Carter,* 265 Cal.App.2d 291, 70 Cal. Rptr. 923, 927 (1968), and *Newman v. Youngblood,* 394 Ill. 617, 69 N.E.2d 309, 314 (1946), no longer reflect the law in those jurisdictions. The California Court of Appeals rejected *Clark v. Carter* in *Riddle v. Harmon,* 102 Cal.App.3d at 531, 162 Cal. Rptr. at 534, and the California legislature codified the *Riddle* rule in Cal.Civ.Code § 683.2. Further, this court erred in relying upon *Newman v. Youngblood* because, as the Illinois Supreme Court stated in that case, "The sole issue involved [was] whether there was good delivery of the deeds conveying the properties in question." *Newman,* 69 N.E.2d at 311.

A substantial number of jurisdictions, including those followed in *Nelson v. Davis,* have now recognized that a severance may be accomplished by a unilateral self-conveyance. While it is true that, as Mr. Knickerbocker points out, many states have not abolished

the need to convey to a strawman to sever a joint tenancy, *see, e.g., Durant v. Hamrick,* 409 So.2d 731, 734–35 (Ala.1981); *Knoche v. Morgan,* 664 P.2d 258, 259 (Colo.Ct.App. 1983); *Ianotti v. Ciccio,* 219 Conn. 36, 591 A.2d 797, 803–04 (1991); *Rotert v. Faulkner,* 660 S.W.2d 463, 469 (Mo.Ct.App.1983), we find that the reasoning of those that have abolished it is more convincing.

The reasoning of the Illinois Court of Appeals in *Minonk State Bank,* 59 Ill.Dec. at 805, 432 N.E.2d at 389, is particularly persuasive. In that case, after pointing out that the Illinois legislature had already abolished the strawman requirement for the *creation* of joint tenancies, Ill.Rev.Stat. ch. 76, § 1(b) (1953), the court observed that "adherence to a rule which would make it more difficult to destroy joint tenancies than to create them, runs contrary to the basic concept of joint tenancy." *Minonk State Bank,* 59 Ill.Dec. at 805, 432 N.E.2d at 389 (citing II *American Law of Property* § 6.2 (1952)). The court reasoned that if a person can create a joint tenancy by granting to himself and another person, a tenant should also be able to sever the joint tenancy by conveying his interest to himself. *Id.* at 807, 432 N.E.2d at 391. In addition, the court stated that the key to determining whether a joint tenancy has been severed is the intent of the parties rather than the four unities. *Id.* at 805–06, 432 N.E.2d at 389–90. The court held that a joint tenant clearly demonstrates an intent to sever by making a unilateral self-conveyance and courts should not frustrate that intent by refusing to recognize the severance. *Id.*

We agree with that analysis. Like the Illinois legislature, the Utah legislature has recognized that the use of a strawman to create a joint tenancy is unnecessary. Utah Code Ann. § 57–1–5.[2] Continuing to require the use of a strawman to sever a joint tenancy would create a lopsided body of law wherein property owners are required to perpetrate legal fictions for one purpose but not for another. There is substantial support for the concept that it is the intent of the parties, not the destruction of one of the four unities, that should govern. 4 *Thomp-* *son on Real Property* 48 (David A. Thomas ed., 1994); II *American Law of Property* § 6.3 (1952); Samuel M. Fetters, *An Invitation to Commit Fraud: Secret Destruction of Joint Tenant Survivorship Rights,* 55 Fordham L.Rev. 173, 186–89 (1986) [hereinafter Fetters]. A unilateral, recorded self-conveyance sufficiently demonstrates an intent to sever.

■ We also find the analysis of the California Court of Appeals in *Riddle v. Harmon* persuasive. The court, after referring to the four unities as one of the ancient vestiges of ceremony that remain the law in many states, reasoned:

> "We are given to justifying our tolerance for anachronistic precedents by rationalizing that they have engendered so much reliance as to preclude their liquidation. Sometimes, however, we assume reliance when in fact it has been dissipated by the patent weakness of the precedent. Those who plead reliance do not necessarily practice it." Thus ... resourceful attorneys have worked out an inventory of methods [such as the strawman method] to evade the rule that one cannot be both grantor and grantee simultaneously.

*Riddle,* 162 Cal.Rptr. at 533 (quoting Roger J. Traynor, *No Magic Words Could Do It Justice,* 49 Cal.L.Rev. 615, 622–23 (1961)). We also note that other courts have been convinced by similar reasoning and have further asserted that it is contrary to sound public policy to prohibit a party from doing directly what that party could do indirectly through the use of a strawman. *Countrywide Funding Corp.,* 589 So.2d at 995–96; *Hendrickson,* 161 N.W.2d at 691. We agree and hold that a joint tenant may sever a joint tenancy by executing a unilateral self-conveyance and recording the deed.

In contending that this court should continue to require strawman conveyances to terminate joint tenancies, Mr. Knickerbocker asserts that such conveyances will ensure that one joint tenant cannot defraud the other by conducting a secret severance transaction. He points out that when one joint

---

2. More than half of the states have statutorily eliminated the need to employ a strawman for the creation of a joint tenancy. 4 *Thompson on Real Property* 16 (David A. Thomas ed., 1994).

tenant secretly severs the joint tenancy, he is free to treat the tenancy as a tenancy in common for his own purposes and if the other tenant dies first, he may destroy any evidence of the severance transaction and become the sole owner of the property. Thus, he argues, a secret severance transaction allows the severing joint tenant to " 'have his cake and eat it too.' " Fetters, *supra,* at 179.

Although an unrecorded and unwitnessed unilateral transaction may allow one joint tenant to defraud the other, that is not at issue in this case. Here, Mrs. Knickerbocker severed the joint tenancy by conveying her interest to herself and promptly recording the deed. Not only did recording the deed eliminate the possibility of fraud, but it provided a clear indication of Mrs. Knickerbocker's intent to sever and it afforded Mr. Knickerbocker a reasonable opportunity to discover the severance. Fetters, *supra,* at 179–89. In these respects, Mrs. Knickerbocker's recorded self-conveyance is equal to a recorded strawman transaction, and it is superior to an unrecorded one. A joint tenant does not eliminate the possibility of fraud by executing an unrecorded strawman transaction because he may destroy all evidence of the transaction by disposing of the two deeds. Further, a joint tenant who fails to record a strawman transaction has not clearly demonstrated the intent to sever because he has reserved the opportunity to destroy evidence of the transaction. Finally, the nonsevering joint tenant does not have a reasonable opportunity to discover the unrecorded strawman transaction. He is completely dependent upon the severing joint tenant or the "strawman" to inform him of the transaction. Thus, sound reasons support our holding that a joint tenant may effectively sever a joint tenancy by executing and recording a unilateral self-conveyance.

### B. The Order in the Divorce Proceeding As Applied to the Unilateral Severance

■ Next, cross-appellants contend that the trial court erred in finding that Mrs. Knickerbocker's unilateral self-conveyance violated the order in the divorce action providing:

> Each of the parties is restrained from selling, encumbering or mortgaging the assets of the parties, including any assets the parties brought into the marriage, during the pendency of this action.

They assert that the purpose of this order was to prevent the parties from removing the marital assets from the jurisdiction of the court and the unilateral self-conveyance did not effect a removal. Mr. Knickerbocker counters that the purpose of the order was to "freeze" the status of the parties' assets and Mrs. Knickerbocker violated this order by severing the joint tenancy and creating a tenancy in common.

We hold that the unilateral self-conveyance did not violate the court order. We agree with cross-appellants that the purpose of orders such as the one at issue is to prevent the parties from removing the marital assets from the jurisdiction of the trial court until the court makes a final decree regarding the division of the assets. As the Arizona Court of Appeals stated:

> The purpose [of such orders is not] to freeze each party's estate plan ... and thus insure that it will be effectuated without alteration in the event one of the parties dies before entry of a final decree. [The purpose] is to forbid actions by either party that would dissipate the property of the marital estate or place it beyond the court's adjudicatory power in the dissolution proceeding.

*Lonergan v. Strom,* 145 Ariz. 195, 700 P.2d 893, 898 (Ct.App.1985). There is substantial authority supporting this interpretation. *See, e.g., Benson v. District Court,* 57 Idaho 85, 62 P.2d 108, 111 (1936); *Girardi v. Girardi,* 140 A.D.2d 486, 528 N.Y.S.2d 397, 398 (App.Div.1988); *Lindsey v. Lindsey,* 342 Pa.Super. 72, 492 A.2d 396, 398 (Super.Ct.1985); *Dyer v. Dyer,* 87 S.W.2d 489, 490 (Tex.Civ.App.1935). *But see Klajbor v. Klajbor,* 398 Ill. 152, 75 N.E.2d 353, 355 (1947); *Franz v. Cormier,* 579 So.2d 1201, 1202 (La.Ct.App.1991). Thus, Mrs. Knickerbocker's unilateral self-conveyance did not violate the trial court's order unless it resulted in the removal of assets from the jurisdic-

tion of the court. We find that it did not accomplish such a removal; it merely changed the form in which Mr. and Mrs. Knickerbocker held title to their residence. *Lonergan,* 700 P.2d at 898. Therefore, the severance was valid, and the residence was held in tenancy in common at Mrs. Knickerbocker's death.

### C. The Order in the Divorce Proceeding As Applied to the Conveyance to the Trustees

■ Cross-appellants' final contention is that Mrs. Knickerbocker's conveyance of her interest in the residence to the trustees of the revocable trust did not violate the trial court's order because it did not result in the removal of property from the court's jurisdiction. We agree.

■ While it is generally held that in the absence of a statute providing otherwise, the creditors of a settlor cannot compel the settlor, in the absence of fraud, to revoke a trust created for the benefit of another, IV William F. Fratcher, *Scott on Trusts* 330.12, at 373 (1989); Restatement (Second) of Trusts § 330, cmt. *o* (1959), a court may compel a revocation in certain circumstances. In a divorce action, the trial court must be able to make such orders concerning the "children, property, debts or obligations, and parties" as will be fair and reasonable to all concerned. Utah Code Ann. § 30–3–5. To make an equitable division of the marital assets, the court needs flexibility to decide upon the evidence whether any property, including property transferred by one spouse into a revocable trust, should be included within the marital estate.

Another court has reached a similar conclusion. In *Lynch v. Lynch,* 147 Vt. 574, 522 A.2d 234 (1987), the Vermont Supreme Court held that property in a trust created by a spouse who retains the power of revocation is marital property subject to equitable division and the court may order the spouse to make the revocation. The court explained:

> [T]he power of revocation is tantamount to ownership of the trust property and of such a nature that it is subject to order of the court. To permit otherwise would be to remove from the court's consideration

all property placed in revocable trusts, with the deleterious effect of allowing spouses to harbor marital assets while maintaining control through a power of revocation.

*Id.* 522 A.2d at 235–36. Since Mrs. Knickerbocker did not insulate the trust assets from the jurisdiction of the trial court, we conclude that she did not violate the court's order prohibiting her and her husband from "selling, mortgaging or encumbering" the marital assets. Moreover, even though Mrs. Knickerbocker died, thereby making irrevocable the revocable trust, the trial court's order was still complied with because the divorce proceeding, and therefore the trial court's order, died with Mrs. Knickerbocker.

## II. THE LIFE INSURANCE POLICY

We now turn to Mr. Knickerbocker's assignments of error. He contends that the trial court erred in concluding that Mr. Cannon, acting under a durable power of attorney, effectively changed the primary beneficiary designation on Mrs. Knickerbocker's MML Bay State life insurance policy from Mr. Knickerbocker to Anthony Cannon and Elaine Cannon as trustees of the trust. He also challenges several of the trial court's underlying findings of fact. We examine the findings of fact first.

### A. Findings of Fact

■ We initially note that we will not overturn findings of fact unless they are clearly erroneous in light of the great weight of evidence or if we are otherwise definitely and firmly convinced that a mistake has been made. Utah R.Civ.P. 52(a).

Mr. Knickerbocker first challenges the court's amended finding of fact and conclusion of law which states:

> On December 6, 1991, James Q. Cannon, acting under his power of attorney, executed a Change of Beneficiary document. He did so with the intention and desire of complying with Christine's desire to have her children named as the designated beneficiaries on any policy of life insurance which she held. On the same day Mr. Cannon sent or caused to be sent a notice

of the change of beneficiary to Northwest Mutual Life Insurance Company which he mistakenly believed was an insurer of Christine's life. Thereafter, on December 16, 1991, Mr. Cannon sent or caused to be sent a further notice of change of beneficiary to [MML Bay State].

Mr. Knickerbocker asserts that because Mr. Cannon testified that he did not know which companies were Mrs. Knickerbocker's insurers when the notice was signed, the finding that he "sent or caused to be sent a notice of the change of beneficiary to Northwest Mutual" and to MML Bay State was erroneous. In support of this assertion, he points out that Mr. Henriod testified that he did not discuss either the Northwest Mutual or the MML Bay State life insurance policy with Mr. Cannon until after Mrs. Knickerbocker's death.

■ We conclude that Mr. Cannon's knowledge of specific life insurance companies is irrelevant because, as Mrs. Knickerbocker's attorney-in-fact, he simply acted in her place, and his own subjective beliefs do not alter the results of his actions. *See* Restatement (Second) of Agency § 20 (1958) (explaining that any person who has capacity to delegate an action to an agent may do so "with the same effect as if he were to act in person"). We find no authority prohibiting a change-of-beneficiary notice from being effective simply because an attorney-in-fact, or even the principal, did not know the specific name of the insurer at the time the notice was executed. The only requirement is that the formalities prescribed by the insurance company must be complied with, Utah Code Ann. § 31A–22–413, and Mr. Knickerbocker does not argue that these formalities required Mr. Cannon to know the name of the insurance company before signing a change-of-beneficiary notice.

■ Mr. Knickerbocker also argues that because Mr. Henriod did not send the notices to Northwest Mutual and MML Bay State until after Mrs. Knickerbocker's death,[3] the delivery was not valid and the trial court erred in finding that Mr. Cannon "sent or

caused to be sent a notice of the change of beneficiary to Northwest Mutual." We acknowledge that the testimony shows that Mr. Henriod did not actually send the notices until after Mrs. Knickerbocker's death. However, once Mr. Cannon signed the notices and entrusted delivery of them to Mr. Henriod, his role was completed, and the change of beneficiaries was effected. *See Uckerman v. Lincoln Nat'l Life Ins. Co.,* 588 P.2d 142, 144 (Utah 1978) (explaining that the reason decedent had not accomplished change of beneficiaries was that he had not delivered his written request for the change to any third party); *cf. Wiggill v. Cheney,* 597 P.2d 1351, 1352 (Utah 1979) (explaining that grantor may accomplish valid delivery of deed if deed passes beyond his control). Therefore, the dates upon which Mr. Henriod sent the notices are irrelevant, and we cannot hold that the trial court's finding was clearly erroneous.

The second finding of fact that Mr. Knickerbocker challenges states:

> James Q. Cannon did everything within his power to change the beneficiary on any policy of insurance held by Christine. The steps which he and Christine took to change the designation of beneficiary were reasonable under the circumstances.

Mr. Knickerbocker argues that Mr. Cannon did not do everything he could to change the beneficiaries because the record shows that he took almost no action before Mrs. Knickerbocker's death to discover the identity of her insurers. In support of his argument, he cites a case in which the Alabama Supreme Court held that a change of beneficiary was not effected where the insured filled out the applicable form but did not mail it or deliver it to any third party prior to his death. *Gibson v. Henderson,* 459 So.2d 845, 847–48 (Ala.1984). He also cites a case in which the Texas Court of Civil Appeals held that a change of beneficiary was not effected where the insured mailed the completed forms to his attorney with instructions to forward them to his insurance company and then committed suicide before the attorney for-

---

**3.** The notice to Northwest Mutual was sent on December 9, 1991, and the notice to MML Bay State was sent on December 16, 1991.

warded the forms. *Witt v. Citizens Nat'l Bank, Waco,* 440 S.W.2d 112, 114 (Tex.Civ. App.1969).

■ We reject Mr. Knickerbocker's argument. As we stated above, Mr. Cannon effected the change of beneficiaries by executing the notices and entrusting their delivery to Mr. Henriod. It was not necessary for Mr. Cannon to learn the identities of the insurance companies. These facts are distinguishable from those of *Gibson,* where the insured simply left the completed forms in his desk without entrusting their delivery to a third party. *Gibson,* 459 So.2d at 846. Likewise, we are not persuaded by the reasoning of *Witt* because that case held that the insured's attorney was essentially his agent and that once the agency terminated at the insured's death, the attorney could take no further action on his behalf. *Witt,* 440 S.W.2d at 114. In another context, we have held that when a client entrusts an attorney with a deed to be delivered, the attorney may carry out the client's instructions even after the client's death. *Wiggill,* 597 P.2d at 1352. Similarly, we recognize that when an insured entrusts a change-of-beneficiary notice to her attorney for delivery with the intent that the change is absolute, the attorney may deliver the notice after the insured's death. *See Van Alstine v. Metropolitan Life Ins. Co.,* 23 Misc.2d 959, 964–65, 193 N.Y.S.2d 354, 360 (N.Y.Sup.Ct.1959); *Tramel v. Estate of Billings,* 699 S.W.2d 259, 264 (Tex.Ct.App.1985). Thus, we reject Mr. Knickerbocker's argument that Mr. Cannon did not do everything in his power to effect the change of beneficiary.

■ Mr. Knickerbocker also contends that the record does not support the trial court's presumption that Mrs. Knickerbocker knew she was the owner of the MML Bay State policy or whether she wanted to change the "primary" or the "secondary" beneficiary designation of the policy. This argument is meritless. The record includes a copy of the MML Bay State life insurance contract naming Mrs. Knickerbocker as the insured and the owner, and her signature clearly appears on this document. Mr. Knickerbocker presented no evidence to persuade the trial court that in spite of her endorsement, Mrs.

Knickerbocker did not know about the policy. Further, he has not presented any arguments convincing us that because she may not have been able to recall the specific names of her insurers, she could not have intended to change the beneficiary designation. To the contrary, we find ample evidence of her intent to change beneficiaries. Mr. Henriod and several members of Mrs. Knickerbocker's family testified that she stated that she wanted her children, rather than Mr. Knickerbocker, to receive the benefit of any policies or accounts that she owned.

The last finding of fact that Mr. Knickerbocker challenges states:

> Christine, acting individually and through her attorney-in-fact, substantially complied with the insurer's requirements for changing beneficiaries on the Policy.

Mr. Knickerbocker argues that this finding is erroneous because the trial court made no findings as to MML Bay State's requirements for changing beneficiaries and there is no evidence supporting the finding that the change-of-beneficiary notice complied with those requirements.

■ The record includes a copy of the MML Bay State policy stating the requirements for changing beneficiaries. The trial court was not obligated to restate them in its findings in order to conclude that Mrs. Knickerbocker had substantially complied with them. The trial court is not required to recite each indicia of reasoning that leads to its conclusions, nor is it required to marshal the evidence in support of them. The only standard used to scrutinize its findings of fact is the "clearly erroneous" standard, which does not permit findings to be overturned unless the great weight of evidence contradicts the finding. *State v. Walker,* 743 P.2d 191, 193 (Utah 1987).

The trial court's conclusion that Mrs. Knickerbocker substantially complied with MML Bay State's requirements for changing beneficiaries does not contradict the great weight of evidence. The policy specified:

> To make a change, a written request, satisfactory to us, must be received at our Principal Administrative Office. The change will take effect as of the date the

request is signed, even if the Insured dies before we receive it.

Mr. Cannon signed the written notices and entrusted delivery of them to Mr. Henriod in satisfaction of these requirements. Case law involving similar policy requirements and similar actions by insured decedents supports the conclusion that Mr. Cannon substantially complied with the policy requirements. *See, e.g., Mutual Life Ins. Co. of New York v. Lowther,* 22 Colo.App. 622, 126 P. 882, 883–84 (1912) (holding that change was effected when decedent mailed notice to insurer); *Wentworth v. Equitable Life Assur. Soc'y,* 65 Utah 581, 588–89, 238 P. 648, 651–52 (1925); *Bergen v. Travelers Ins. Co.,* 776 P.2d 659, 663 (Utah Ct.App.1989) (holding that decedent had substantially complied with policy requirements by mailing a letter requesting change in apportionment of proceeds to be received by beneficiaries to his insurance agent, who sent it to general agent). Thus, the trial court's finding is not clearly erroneous.

### B. Conclusion of Law

■ Next Mr. Knickerbocker contends that the following conclusion of law is erroneous:

As Christine's attorney-in-fact, James Q. Cannon, successfully changed the designation of beneficiary on Christine's [MML Bay State] life insurance policy by substituting her children, Isaac and Abigail Jacobsen, for Mr. Knickerbocker. As a result Mr. Knickerbocker now has no interest in the proceeds of the Policy.

Upon review, we accord this conclusion no deference but review it for correctness. *Gillmor v. Wright,* 850 P.2d 431, 433 (Utah 1993).

■ Mr. Knickerbocker argues that under basic contract law principles, the conclusion that Mr. Cannon successfully changed the beneficiaries is erroneous because there was no meeting of the minds. To have a meeting of the minds, he argues, Mr. Cannon, as Mrs. Knickerbocker's agent, would have had to know of the MML Bay State policy and MML Bay State would have had to know of the change of beneficiary. We disagree. The issue of whether Mr. Cannon

changed the beneficiaries cannot be resolved under general contract law principles because changing the beneficiaries of a life insurance policy does not create a new contract. *Pendleton v. Great S. Life Ins. Co.,* 135 Okla. 40, 273 P. 1007, 1009 (1929). In addition, this court has already held as a matter of law that the insurer does not need to know of the change of beneficiary before the change is effected. *Wentworth,* 65 Utah at 593, 238 P. at 653–54. Further, as we explained above, it is irrelevant whether Mr. Cannon knew of the MML Bay State policy because he was acting as Mrs. Knickerbocker's attorney-in-fact. Although, as Mr. Knickerbocker points out, the knowledge of an agent can affect the liability of a principal, Restatement (Second) of Agency § 272 (1958), Mr. Cannon's lack of knowledge in this case did not invalidate the change-of-beneficiary notice because Mrs. Knickerbocker knew of the policy and Mr. Cannon was acting in accordance with her wishes. Thus, we reject Mr. Knickerbocker's argument that a meeting of the minds between Mr. Cannon and MML Bay State was necessary to effect the change.

■ Mr. Knickerbocker also argues that equitable considerations justify the reversal of the trial court's conclusion that Mr. Cannon effected the change of beneficiary. He asserts that Mrs. Knickerbocker's MML Bay State policy was part of a "comprehensive estate plan." As evidence of this, he points out that he owned a similar policy naming Mrs. Knickerbocker as primary beneficiary and that the premiums for the two policies, which totaled more than $14,000 in 1991, were paid from their joint checking account. Thus, he argues, the MML Bay State policy was part of an implied contract he had with Mrs. Knickerbocker and she breached the contract by removing him as beneficiary.

■ We find no merit in this argument. This court has already held that a beneficiary has a mere expectation and cannot interfere with the owner's right to change beneficiaries. *Culbertson v. Continental Assur. Co.,* 631 P.2d 906, 909–10 (Utah 1981); *Jensen v. Eddy,* 30 Utah 2d 154, 160, 514 P.2d 1142, 1146 (1973); *see also*

Utah Code Ann. § 31A–22–413. This is true even if the insurance policy at issue was obtained as part of a marital estate plan. This court has already indicated that it will not consider the origin of the premium payments in determining whether an insured accomplished a change of beneficiary. *Wentworth*, 65 Utah at 595, 238 P. at 654; *see also Sieroty v. Silver*, 58 Cal.2d 799, 26 Cal.Rptr. 635, 376 P.2d 563 (1962). Thus, we affirm the trial court's conclusion that Mr. Cannon succeeded in changing the beneficiaries on Mrs. Knickerbocker's MML Bay State life insurance policy.

### III. CONVERSION

■ Mr. Knickerbocker's final contention is that the damages the trial court awarded to him for Mr. Cannon's conversion of household furnishings and a Jeep were inadequate. Because the adequacy of damages is a question of fact, we cannot overturn the trial court's findings unless they are clearly erroneous. Utah R.Civ.P. 52(a).

### A. The Household Furnishings

■ The parties entered into a stipulation categorizing the household furnishings into three groups: (1) items owned solely by Mrs. Knickerbocker, (2) items owned solely by Mr. Knickerbocker, and (3) items owned by them in tenancy in common. The court approved the stipulation and awarded the furnishings accordingly. Nominal damages in the amount of $2 were awarded to Mr. Knickerbocker for the conversion of the furnishings in which he held an interest.

Mr. Knickerbocker assails the award of damages asserting that it does not find support in the evidence. He relies upon an appraisal he obtained from an expert personal property appraiser fixing the fair market value of all of the property at $67,476. The appraiser then opined that the fair rental value of all that property for the thirty-eight weeks it was in storage was $126,000. Mr. Knickerbocker argues that although he did not have ownership in all of the property, he had a "possessory interest" in all of it until such time as the court determined the ownership of each item. Thus, he concludes that he was entitled to the fair rental value as

testified to by the expert appraiser. We disagree.

Mr. Knickerbocker cites no authority for the proposition that he had a "possessory interest" in the separate property of his wife which would entitle him to damages when it was removed from their house. We therefore conclude that he had no such entitlement. As to the items which they held as tenants in common, Mr. Knickerbocker was excluded from possession and was entitled to damages for the loss of use of his one-half interest. *Gillmor v. Gillmor*, 694 P.2d 1037 (Utah 1984); *Utah Oil Ref. Co. v. Leigh*, 98 Utah 149, 96 P.2d 1100 (1939). He was also entitled to loss of use of the items which he owned solely.

■ At the time the expert appraiser made her appraisal of the household furnishings, the parties had not yet stipulated as to the ownership of each item. Consequently, the appraiser appraised each of the 176 items separately without regard to which category of ownership they would eventually fall into. The stipulation of the parties resulted in Mrs. Knickerbocker's owning most of the items, including the more valuable ones. For example, a grand piano appraised at $22,500 (which alone represents approximately one-third of the total appraised value of all items) was stipulated to be hers. No attempt was made by Mr. Knickerbocker to provide the trial court with a breakout of the appraised value of items stipulated to belong to him. Similarly, there was no such attempt with respect to the jointly owned property. Nor did he provide any evidence of the fair rental value of the items stipulated to be his and his one-half of the items owned in tenancy in common. In view of the large number of items, we do not believe that it was incumbent upon the trial court to break out each of the 176 items from the appraisal and place them in the three categories, total the values in each category, and then endeavor to arrive at a fair rental value of each category. Some of the items, such as the grand piano and the better pieces of furniture, would obviously be more in demand for rental purposes than would minor items such as books, odd dishes, and Christmas decorations. Thus, the trial court was not required to find that each of

the items could have been profitably rented during the nine months they were in storage. We therefore conclude that in view of the absence of relevant evidence before the trial court, it did not err in awarding Mr. Knickerbocker nominal damages of $2 as the fair rental value of the items of household furnishings in which he held an interest.

### B.  The Automobiles

■ The trial court held that because Mr. Knickerbocker became the sole owner of the Jeep by right of survivorship at his wife's death, he was entitled to its fair market value.  The court fixed that value at $12,900, the amount for which the Jeep was sold to an automobile dealership after Mrs. Knickerbocker's death.

Mr. Knickerbocker contends that this finding is clearly erroneous.  He points out that blue book prices introduced into evidence show that the value of a Jeep like the one at issue was $16,975, the "average trade-in" was $14,125, and the "average retail" was $16,350 at the time it was sold.  He also asserts that although a dealership paid Mr. Cannon only $12,900 for the Jeep, the sale was a "fire-sale" and the price did not reflect the fair market value.  Finally, he argues that the measure of damages for unreturned, converted property is the fair market value of the property plus interest and the trial court erred in failing to award him interest.  *Murdock v. Blake*, 26 Utah 2d 22, 30, 484 P.2d 164, 169 (1971).

We find that the trial court's award of $12,900 was not clearly erroneous.  As Mr. Knickerbocker points out, the general rule is that

> damages awarded for personal property that is taken or destroyed are based on the item's market value at the time of the taking or destruction.  Ordinarily, market value is defined as the price for which an article is bought and sold and for which there exists a demand in the market place, and the legal definition of that price is retail, not wholesale.

*Winters v. Charles Anthony, Inc.*, 586 P.2d 453, 454 (Utah 1978).  However, the trial court is in a better position to determine whether the blue book price, the sale price,

or any other price accurately reflects the market value of the vehicle in light of the condition of the vehicle, the market demand, the mileage on the vehicle, and other relevant factors.  The trial court has discretion in determining the market value of property, and Mr. Knickerbocker has not presented any evidence convincing us that the court abused that discretion in finding that the market value was the price for which the vehicle was sold rather than the Jeep's blue book price.

■ With regard to the issue of interest, an owner whose property has been converted is entitled to interest as a matter of law.  18 Am.Jur.2d *Conversion* §§ 121–23 (1985); *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1291 (Utah 1993).  Thus, we remand this issue to the trial court for the entry of an order awarding Mr. Knickerbocker interest on the sale price.

Mr. Knickerbocker testified at trial that the Thunderbird title was in his name.  No evidence to the contrary was produced.  Thus, the trial court did not err in awarding it to him.

## IV.  CONCLUSION

In sum, we hold that the marital home of Mr. and Mrs. Knickerbocker was held in tenancy in common at Mrs. Knickerbocker's death because she severed the joint tenancy by executing and recording a quitclaim deed of her interest from herself as a joint tenant to herself as a tenant in common.  This severance did not violate the trial court's order prohibiting Mr. and Mrs. Knickerbocker from "selling, encumbering or mortgaging" their assets because it did not remove the home from the court's jurisdiction.  Likewise, Mrs. Knickerbocker's conveyance of her interest to the revocable trust for the benefit of her children did not violate the order.

In addition, we affirm the trial court's conclusion that Mr. Cannon successfully changed the beneficiaries on Mrs. Knickerbocker's MML Bay State life insurance policy because he signed the change-of-beneficiary notices and entrusted Mr. Henriod with the task of sending them to Mrs. Knickerbocker's insur-

ers before her death. Finally, we hold that the trial court did not err in awarding Mr. Knickerbocker nominal damages for the conversion of personal property from the home and in awarding him the Thunderbird and the sale price of the Jeep. However, Mr. Knickerbocker is entitled to interest on the sale price, and we remand accordingly.

Affirmed in part, reversed in part, and remanded in part.

ZIMMERMAN, C.J., STEWART, A.C.J., DURHAM and RUSSON, JJ., concur.