404 P.2d 253

R. E. WALKER et al., heirs of the Estate of
John A. Walker, Plaintiffs and Appellants,

v.

J. B. WALKER, Defendant and Respondent.

No. 10286.

Supreme Court of Utah.

July 19, 1965.

------◆------

Thomas C. Cuthbert, Frank J. Allen, Salt Lake City, for appellants.

H. Arnold Rich, Max K. Mangum, Salt Lake City, for respondent.

CROCKETT, Justice.

Plaintiffs are heirs of the estate of John A. Walker who died in 1912 and the probate of whose estate has not been completed. They join in suing the oldest son, John B. Walker, for their respective distributive shares in two parcels of land in Union, in southeast Salt Lake County, which they claim to be family property. Title to the land in question has stood in the name of the defendant for over 40 years. After a plenary trial of the issues, the court found in accordance with the contention of the plaintiffs: that the defendant held this property as trustee for the family and that the plaintiffs should have their respective shares therein, provided, however, that the defendant has a lien on such property for moneys he had advanced to keep the family from losing the property. The decree conditioned plaintiffs recovery upon repayment to the defendant of the amount of the lien in the sum of $5,614.00 principal and $16,143.36 interest, within 30 days after demand by the defendant.

Neither the plaintiffs nor the defendant appear to have been satisfied with the determination made by the trial court. The plaintiffs appeal challenging: (a) the amount of the lien; (b) the refusal to apply the statute of limitations and/or laches; (c) the period for which interest was allowed; and (d) the provision of the decree which would peremptorily divest them of their interest if the amount of the lien was not paid within 30 days after demand. On cross appeal defendant urges: that he owns the property absolutely so the plaintiffs should be precluded from any recovery whatsoever; and that in any event the trial court did not allow him sufficient credits for money paid out to protect the family's interest in the lands. Where there is a

dispute in the evidence we view it in the light most favorable to the trial court's findings.[1]

When the father of this family died in 1912, he left his widow Minnetta Walker and six children: John B. Walker, age 20; Robert E. Walker, age 18; Alta F. Walker, age 14; Ila M. Walker, age 11; Austin L. Walker, age 9; and Roma Walker, age 7. His widow was appointed administratrix of his estate, and published notice to creditors. No further proceedings were had until after Minnetta Walker died in 1959. A successor administrator was appointed in 1960.

Minnetta Walker appears to have been a woman of considerable resourcefulness in mothering and managing for her family. They continued to operate the family store, the Union Co-Operative Mercantile Company, and the farm. The two older sons, John B. and Robert E. were sent to college. In 1915 a family enterprise of hauling ore by team and wagon from the Cardiff Mine in Cottonwood Canyon was initiated. The horses and equipment were owned by the family and the work was done by the two older sons, John B. and Robert E. Walker. This hauling business was continued and became known as the J. B. Walker and R. E. Walker Trucking Company and was ostensibly a partnership between them. In succeeding years the mother and the boys both borrowed money on the family proper-ty to obtain trucks and equipment for this purpose. In 1920 a mortgage was given on part of the family property to secure a loan of $4,000.00 some of which was to pay off a prior mortgage these boys had signed. On default in paying the mortgage, it was fore-closed and on February 10, 1922 the proper-ty was sold at Sheriff's Sale to a Mr. Dayton. Meanwhile the store had not pros-pered sufficiently to meet expenses and sup-port the family, and pursuant to judgments taken against it, was sold on execution sale.

In this setting, after the period of re-demption on both of the sales just referred to had expired, the oldest son, defendant J. B. Walker, undertook to raise the money to save the family property and on October 9, 1922 a written agreement between mem-bers of the family was executed. It states in part:

"1. That second party [J. B. Walk-er] is hereby authorized and directed to diligently attempt to pay any and all of the obligations hereinbefore referred to in so far as he is able to pay the same.

"2. That the first parties [Walker heirs] agree to pay upon demand to second party * * * eight-ninths of all the money which he shall advance and pay on account of the claims, * * with interest thereon at the rate of eight per cent per annum from the date of any and all of said payments, it being

---

1. See Fleming v. Fleming-Felt Company, 7 Utah 2d 293, 323 P.2d 712, 714 (1958);

Buehner Block Company v. Glezos, 6 Utah 2d 226, 310 P.2d 517, 520 (1957).

understood that the remaining one-ninth of said payments is the share which second party is required to pay of said obligations. \* \* \*

"3. The first parties [Walker heirs] do hereby give and grant to the second party [defendant J. B. Walker] a lien upon all of the real estate in this contract specifically described, together with said water rights, for the purpose of securing the payment of first parties to second party of any and all payments which shall be made by second party, pursuant to the terms of this agreement."

J. B. Walker did arrange finances to pay off the debts; and on October 19, 1922 received a deed from Mr. Dayton for the mortgage foreclosed property; and on August 24, 1923 received a deed of the store property from the Association of Credit Men. Members of the family have since continued to reside on the property including the mother until her death in 1959. The youngest brother, Austin Walker, has lived there and farmed the land with the understanding that he could do so for the payment of taxes, which he has done, except for some taxes which have been paid by J. B. Walker.

Meanwhile J. B. and R. E. Walker had incorporated their business in 1931 and jointly continued its operation until shortly after the death of their mother. On June 6, 1959, after dissension between them, they arrived at a settlement in which R. E. conveyed to J. B. all of his interest in the corporation and any interest in the old partnership property, but reserved his interest in the estate of his father John A. Walker.

It was upon the refusal of J. B. Walker to recognize the interests of the plaintiffs in the family property subsequent to the mother's death in 1959 that this action was commenced in 1962 to impose a trust upon the theory that in taking title to these properties J. B. Walker was acting for his mother and brothers and sisters, the heirs of his father's estate.

The primary issues, to which other issues in this case are subordinate, are the contentions of the defendant: that he owns the property in question absolutely and that the plaintiffs have no interest whatsoever therein; and that in any event, their rights are barred by the statute of limitations and/or laches. It is obvious that if the position of the defendant were correct in that regard, other issues in the case would become moot.

We perceive nothing in the fact situation which would justify reversing the finding that J. B. Walker was acting as trustee for the family in regard to this property. In addition to the written agreement, which is entirely consistent with such a finding, there is the fact of the family relationship and their previous co-owner-

ship of the property. It is generally recognized that where one co-owner does something for the protection of their common property, it is presumed that his action was to preserve it for the benefit of all unless some indication to the contrary plainly appears.[2] That the trial court correctly regarded J. B. Walker as a trustee is pointed up by this recital in his own brief:

"The primary objective of defendant was to provide a home for his mother and her family and this was accomplished by defendant. For 42 years the family has lived in the home rent free, without even so much as payment of taxes, * * * and in his claims for credit defendant has asked no accounting for rentals or occupancy, by other members of the family, since he left the parental home in 1931."

The problem of the statute of limitations and/or laches as involved here is somewhat unusual in that each side accuses the other of delay and invokes that defense. Defendant contends that inasmuch as he took deeds to the property in his own name over 40 years ago, if the plaintiffs ever had any rights therein, they have slept on those rights for so long that laches should prevent them from now attacking his ownership.

On the other hand the plaintiffs interpose the same objection to the defendant's claim to reimbursement for funds advanced many years since and for which the defendant has never heretofore made any demand for payment. This situation reminds one of a chess game in which the players each insist that the other has the next move. The question is posed: was it up to the heirs to make the first move by demanding the property from the defendant? Or was it the latter's duty to demand from the heirs the money advanced to protect the property? The answer to such a stalemate seems to be that the burden of taking some affirmative action should be upon him who accuses the other of delay; and unless he has taken such action, or in some manner put the other party on notice that action is required, he cannot take advantage of the delay.

Defendant's invocation of the statute of limitations and laches runs counter to the rule that such a defense is not available to a trustee as against his beneficiaries until something has occurred to give a clear indication to them that he has repudiated his trust;[3] or the circumstances are such that they must be charged with knowledge of such repudiation.[4] No such situa-

---

2. See Sperry v. Tolley, 114 Utah 303, 199 P.2d 542, 546 (1948); McCready v. Fredericksen, 41 Utah 388, 126 P. 316 (1912); and Heiselt v. Heiselt, 10 Utah 2d 126, 349 P.2d 175 (1960).

3. See Child v. Child, 8 Utah 2d 261, 332 P.2d 981 (1958).
4. See Acott v. Tomlinson, 9 Utah 2d 71, 337 P.2d 720, 721 (1959).

tion existed here. But there are several factors which tend to support the trial court's determination. Where a near relative is involved courts are less inclined to find a repudiation. This is so because of the greater likelihood that the beneficiaries have reposed confidence in him; and also, they would have a natural reluctance to sue him unless circumstances forced them to do so.

■ Under the facts shown there wouldn't be anything strange or unreasonable about the plaintiffs assuming, as they say they did, that the defendant was holding the property for the family until after the death of their mother, so that she would be provided with a home; and that after her death, their father's estate would be settled and each would receive his share. These considerations, together with the fact that some members of the family remained in the property, make the refusal of the trial court to apply laches against the plaintiffs harmonize with reason.

■ The reasons stated above which militate against the defendant asserting laches against the plaintiffs also apply in principle to the plaintiffs' charge that the defendant J. B. Walker should be barred from claiming reimbursement for the moneys advanced to protect the family property. In that connection it should be kept in mind that after he took title to the property in his own name, somewhere along the line he formed the intention of claiming it for his own. Therefore from his point of view it is neither unnatural nor illogical that he made no demand for reimbursement for the moneys he had advanced. Where this impasse existed and both parties seemed satisfied with the status quo, and neither took any affirmative action to change it, neither is in a position to blame the other for delay and invoke laches against him. We think the trial court was patently correct in ruling that inasmuch as the 1922 agreement is binding upon the defendant, making him a trustee, by the same token it should be binding upon the plaintiffs and require them to recognize the lien provided for therein and reimburse him for the money he expended to protect the family property.

• ■ The plaintiffs also make several contentions attacking the amount of reimbursement allowed defendant. They assert that the trial court should have taken into account the fact that some of the money raised to pay off the family debts was used to discharge debts incurred by J. B. Walker and his brother R. E. Walker prior to 1922. It will be recalled that at that time these two older brothers were working in connection with the family enterprise and to support them all. We think the court wisely and correctly refused to go back of the 1922 agreement and to assume that all prior

mutual claims and demands were merged into it.[5]

Plaintiffs advance another argument that the money used to protect the family property was actually paid by the J. B. and R. E. Walker partnership and/or later by the corporation and that this was a family enterprise, so defendant J. B. Walker is not personally entitled to reimbursement. As to that argument, it is difficult to see how the other heirs [plaintiffs] could claim any benefit from payment from this business which was carried on by the defendant and R. E. Walker. But beyond this, and in regard to the rights of all of the heirs, including R. E. Walker, in connection with the settlement of their affairs in 1959 all of the assets of the corporation were assigned to the defendant J. B. Walker, reserving to R. E. Walker only rights which he had in the estate of his father John A. Walker. The trial court correctly regarded this as not reserving any share in rights to reimbursement for money used to protect the family property, which right was by the 1922 agreement agreed to belong to J. B. Walker. Whatever money may have been so expended was paid at the instance of J. B. Walker who had undertaken the responsibility of protecting the family property and he was entitled to reimbursement for any advancements the first party or corporation had made for that purpose.

The defendant also takes his turn at criticizing the accounting. He avers that he was not allowed sufficient credit for moneys advanced, including particularly for taxes paid on family property which stood in his mother's name. We do not doubt the validity of his argument that a trustee is entitled to reimbursement for all expenses properly incurred in discharging the responsibilities of his trust.[6] But it is his duty to keep full, accurate and orderly records. When any question arises as to their sufficiency or accuracy, the burden is upon him to show the correctness of his accounts; and doubts may be resolved adversely to him.[7] In regard to the non-allowance of other expenses claimed, the trial judge made this observation which characterizes his view of the records kept:

"Oh, I don't think I'm going to allow that. These accounts kept with each other [J. B. and R. E.] here are inconclusive, impossible of reconcilement, kept for what I suppose was their own purposes * * *."

It is apparent that the trial court was not persuaded of the correctness of defendant's claims; and this court is not convinced that the evidence so preponderates against the

5. See Ephraim Theatre Co. v. Hawk, 7 Utah 2d 163, 321 P.2d 221.
6. See Restatement (Second), Law of Trusts, Section 244.

7. See Bogert, Trusts and Trustees (Second Edition), Section 962; Wood v. Honeyman, 178 Or. 484, 169 P.2d 131, 162, 171 A.L.R. 587 (1946).

trial court's findings that they should be reversed.[8] On the contrary, we take occasion to observe that the trial judge appears to have done quite a commendable job in dealing with the multifarious activities of this family over a period of 40 years and in arriving at what impresses us as a just and equitable result.

The final point worthy of note is plaintiffs' contention that the judgment was in error in providing that if they failed to reimburse defendant within 30 days after demand they would lose their interest in the property. They urged that if they so fail the defendant should only be entitled to foreclose his lien which would afford them some advantage in giving them time to obtain finances and if necessary to redeem.[9] This might be true if this were simply a lien foreclosure action. But it is not. It is a plenary suit in equity which, in harmony with the purposes of our new rules of civil procedure, in permitting the trial and settlement of all issues germane to the subject matter of a controversy and to avoid a multiplicity of lawsuits,[10] afforded the parties an opportunity for the presentation and adjudication of all of their claims relating to the family property.[11] They availed themselves of that opportunity and the claims have been adjudicated. It was consistent with that purpose for the trial court to not require resort to a special procedure for the foreclosure of defendant's lien, but to adjudicate that the plaintiff should have their respective interests in the property, subject to their reimbursement of the defendant for the moneys he had advanced to protect it; and that they be given a reasonable time to raise the money and perform that condition. The court acted within its equitable powers providing a procedure which would deal fairly with and protect the rights of both parties.[12] We suggest that a reasonable time for meeting the condition would be 60 days after the remittitur of this case.

Affirmed. The parties to bear their own costs.

HENRIOD, C. J., and McDONOUGH, WADE, and CALLISTER, JJ., concur.

---

8. See Gibbons v. Brimm, 119 Utah 621, 230 P.2d 983.
9. As to right of redemption upon foreclosure of mortgages and liens see Section 78-37-6, U.C.A.1953.
10. See Rule 54(c) (1) U.R.C.P.; See also Taylor v. E. M. Royle Corp., 1 Utah 2d 175, 264 P.2d 279 (1953); and Prudential Federal Savings & Loan Association v. Hartford Accident & Indemnity Co., 7 Utah 2d 366, 325 P.2d 899 (1958).

11. See Rules 8 and 18, U.R.C.P.
12. Rule 54(c) U.R.C.P. provides that: " * * * [E]very final judgment shall grant the relief to which the party * * * is entitled * * * " and Rule 83 provides that the District Courts " * * * may regulate their practice in any manner not inconsistent with these rules and the statutes of this state."