2000 UT 20

**Lynda SNOW, Plaintiff and Appellee,**

**v.**

**Gloria RUDD, Defendant and Appellant.**

**No. 981419.**

Supreme Court of Utah.

Jan. 21, 2000.

Rehearing Denied March 29, 2000.

E. Craig Smay, Salt Lake City, for plaintiff.

David W. Scofield, Paige Bigelow, Salt Lake City, for defendant.

ZIMMERMAN, Justice:

¶ 1 This case arose from an action by Lynda Snow ("Lynda"), against her sister, Gloria Rudd ("Gloria"), to impose a constructive trust on real property that was sold to Gloria by their father. The trial court granted Lynda's motion for partial summary judgment, holding that their father, as trustee of a trust which held the property, breached his trust obligation and, therefore, that the sale was voidable. The trial court also denied a motion for summary judgment by Gloria, ruling, *inter alia*, that the statute of limitations did not begin to run on Lynda's claim until 1993. The matter was submitted to the jury on issues concerning an accounting for the trust assets, and elements of a laches claim. Gloria appeals, raising a series of contentions. She claims that Lynda had no standing to bring this suit. She also claims that the trial court erred in: (i) denying Gloria's motions for summary judgment on the statute of limitations and laches issues; (ii) imposing a constructive trust on the sale of the property to Gloria; (iii) denying Gloria reimbursement for her expenditures as constructive trustee of the trust; and (iv) awarding Lynda attorney fees and costs, and in holding that these fees had to be paid by Gloria personally or from her portion of the trust assets. Because we reverse the trial court's grant of summary judgment in favor of Lynda on the statute of limitations issue, we have no occasion to address the other points raised.

¶ 2 We first state the facts, which we recite in a manner most favorable to Gloria, the party opposing summary judgment. *See Wilkinson v. Union Pac. R.R. Co.*, 975 P.2d 464, 465 (Utah 1998). On June 17, 1976, Dr. Lyndon Daynes Snow ("Dr.Snow") and Mrs. Glayde V. Snow ("Mrs.Snow") created a trust called the Inter Vivos Trust of Glayde V. Snow (the "Glayde V. Snow Trust"). Mrs. Snow was the trustor and Dr. Snow was the trustee. On August 9, 1976, Dr. and Mrs. Snow conveyed their family home, located at 381 11th Avenue, in Salt Lake City, as well as an adjacent lot, to Dr. Snow as trustee of the Glayde V. Snow Trust. Mrs. Snow was to receive the net income of the Glayde V. Snow Trust during her life, as well as so much of the principal as the trustee deemed "necessary or appropriate for the health, support and maintenance of the Trustor, having in mind the standard of living to which the Trustor [had] been accustomed." If Dr. Snow survived Mrs. Snow, he was directed to provide for his benefit all of the net income from this trust. Upon the death of Dr. and Mrs. Snow, Gloria and Lynda, if still living, were to receive in equal shares any residual assets of the trust. Furthermore, if Dr. Snow died or in some other way ceased to be trustee, both Gloria and Lynda became successor trustees.

¶ 3 On October 15, 1977, Mrs. Snow passed away. Dr. Snow then approached

Richard Rudd, Gloria's husband, asking him to purchase the family home. When Richard refused, Dr. Snow asked Gloria to buy the home, which she agreed to do. On May 8, 1978, they entered into a real estate contract under which Dr. Snow would be allowed to live in the house rent free, and Gloria would make payments to Dr. Snow on the purchase price of the home and also assume all the financial responsibilities of ownership of the home. After a few years, Gloria told Dr. Snow she could not afford to continue to pay expenses related to the maintenance of the home as well as make payments on the purchase contract. She discontinued making payments on the contract, but continued to pay the operating expenses of the home.

¶ 4 In 1984, Dr. Snow consulted an estate planning attorney, Mr. Jay Gamble. Dr. Snow informed Mr. Gamble of his previous estate plan. Mr. Gamble suggested that Dr. Snow start over by creating a new trust and that he complete the conveyance of the home to Gloria by a forgiveness of the remaining purchase money debt. A meeting in furtherance of this new plan took place on December 27, 1984, between Dr. Snow, Mr. Gamble, Lynda, and Gloria. At this meeting, Dr. Snow's estate plan was reviewed, including his newly created inter vivos trust ("the Dr. Snow Trust") and the debt forgiveness related to the sale of the home to Gloria. Lynda heard references during the meeting to the Glayde V. Snow Trust, but, in her deposition testimony some ten years later, she could not recall the substance of any specific references to it.

¶ 5 In March of 1985, Lynda received a package of documents which included a copy of the warranty deed transferring the family home to Dr. Snow as trustee of the Glayde V. Snow Trust; a copy of the real estate contract in which Dr. Snow, as trustee of the trust, sold the family home to Gloria; and a copy of the warranty deed, which transferred title to the property to Gloria. Each of these documents clearly stated that one of the parties to the transaction was Dr. Snow, as trustee of the Glayde V. Snow Trust. Lynda testified that she was confused as to what the Glayde V. Snow Trust was. When she approached her father to ask about the Glayde

V. Snow Trust, he told her not to worry and that it had been taken care of. She made no further inquiry into the nature of the Glayde V. Snow Trust until after her father's death because, as she testified, she had no reason to "primarily" distrust her father and did not want to call him a liar. But, she also testified that she felt that her father lied to her on occasion, and that both Gloria and Dr. Snow were lying about the family home. Lynda testified that during this time she asked Gloria questions about the sale of the family home. She testified that when she questioned her father on this issue, Dr. Snow told her that no sale had really taken place, and that the terms of the real estate contract were not being fulfilled. Lynda alleged that because she always received different and vague answers when she asked about the sale of the property to Gloria, she eventually stopped inquiring.

¶ 6 Dr. Snow died on May 18, 1993, and soon thereafter the family home was listed and sold by Gloria. Lynda claims that following Dr. Snow's death, references to the Glayde V. Snow Trust in his papers caused her to search for the actual document establishing this trust. She contacted retired Judge Joseph Jeppson, whom her mother had mentioned in the 1970s as having helped with the estate plan, and he gave her a copy of the Glayde V. Snow Trust. Lynda testified that she could have asked Judge Jeppson for the document when she first learned of the trust, but did not do so until almost ten years later, after Dr. Snow's death. She further testified that no one stopped her from inquiring as to the terms of the Glayde V. Snow Trust or from obtaining a copy of the trust.

¶ 7 In January of 1994, Lynda filed a claim to impose a constructive trust on the proceeds of the sale of the family home. In the complaint, she asserted that the sale of the home was without adequate consideration and was in violation of the terms of the trust; that the sale of the property operated to impose a trust on the proceeds "in favor of the Glayde V. Snow Trust and its beneficiaries"; and that Gloria was guilty of fraud. Gloria answered asserting, *inter alia,* a defense of laches and statute of limitations.

There followed a series of motions for summary judgment addressing various issues. For the purpose of this opinion, it suffices to say that by the time of trial, the trial court had determined as a matter of law that the Glayde V. Snow Trust gave no power to the trustee to forgive payments due on a contract for sale of trust assets. The conveyance of the trust property to Gloria was "unauthorized and in violation of the trust," and any proceeds from the sale were subject to the terms of the Glayde V. Snow Trust. As to Gloria's defenses, the court held that the statute of limitations period did not begin to run until Lynda "could have discerned the existence of a cause of action," which point the court fixed as "when she obtained a copy of the Glayde V. Snow Trust, following the death of Dr. Lyndon Snow in 1993." Therefore, it concluded that the action was timely filed.

¶ 8   In September of 1997, a jury trial began to resolve the outstanding evidentiary issues which included the question of whether Lynda's claim was barred by laches. At the close of the second day of trial, the trial court took the laches issue away from the jury by ruling that as a matter of law Lynda could not be charged with undue delay for waiting to bring her suit until she obtained a copy of the trust document. The court struggled with whether the statute of limitations issue should be decided by the jury. Even though the court had decided that the statute of limitations period began to run when Lynda received the trust document, less than a year before the suit was filed, the court was concerned that its decision would be reversed on appeal. Therefore, the court allowed in all evidence relevant to the statute of limitations issue. The court also asked the parties to propose questions for a special verdict that would address whether and when Lynda had notice of the breach of trust. Some questions that appear directed at the statute of limitations issues were included in the verdict form, although those proposed by Gloria were rejected. And despite the inclusion of these questions in the verdict form, and a request by Gloria's counsel for jury instructions on the statute of limitations issues, when the jury was instructed, no mention of the statute of limitations defense was included. The matter was submitted and the jury returned a special verdict finding, *inter alia*, that "prior to the death of Dr. Snow, . . . Lynda Snow [did not] know of her rights under the Intervivos Trust of Glayde V. Snow," nor was she "fully aware of all facts necessary to show that the conveyance of the [family home] to defendant was a violation of plaintiff's rights as a beneficiary of the Intervivos Trust of Glayde V. Snow."

¶ 9   Gloria now appeals, raising a number of issues. We address only the trial court's denial of Gloria's motion for summary judgment on the statute of limitations issue.[1] A trial court's grant or denial of summary judgment is reviewed for correctness. *See Gerbich v. Numed, Inc.*, 977 P.2d 1205, 1207 (Utah 1999). Here, the trial court held that the statute of limitations was tolled until 1993, when Lynda actually obtained a copy of the trust document and learned the details of its contents. On appeal, Gloria argues that the statute of limitations period ran from either January of 1985, when Dr. Snow forgave Gloria's indebtedness, and Lynda contends the breach of trust occurred, or at the latest, in March of 1985, when Lynda had information that would have put a reasonable person on notice to inquire. Gloria contends that because the four-year period contained in section 78–12–25 of the Code applies, the action is barred.

¶ 10   We have generally held that a statute of limitations period begins to run " 'upon the happening of the last event necessary to complete the cause of action.' " *Berenda v. Langford*, 914 P.2d 45, 50 (Utah 1996) (quoting *Myers v. McDonald*, 635 P.2d 84, 86 (Utah 1981)). Here, that would be when the breach occurred. But in certain circumstances, we apply a "discovery rule" which benefits a plaintiff by operating "to toll the period of limitations 'until the discovery of facts forming the basis for the cause of action.' " *Walker Drug Co. v. La Sal Oil Co.*, 902 P.2d 1229, 1231 (Utah 1995) (quoting *Myers*, 635 P.2d at 86). We apply the dis-

1.   For the purposes of this opinion, we assume Lynda has standing to bring suit.

covery rule only when required by statute, when a defendant has affirmatively concealed a plaintiff's cause of action, or when exceptional circumstances exist. *See Berenda,* 914 P.2d at 51.

¶ 11 Before we proceed with our analysis, we must clarify an ambiguity in the law. We have held that when a case involves a trust, a trustee cannot take advantage of a statute of limitations defense until something has occurred to give the beneficiary a "clear indication" that a breach or repudiation has occurred, or, alternatively, the circumstances must be "such that [the beneficiary] must be charged with knowledge" of such a repudiation or breach. *Walker v. Walker,* 17 Utah 2d 53, 404 P.2d 253, 257 (Utah 1965); *Acott v. Tomlinson,* 9 Utah 2d 71, 337 P.2d 720, 724 (Utah 1959). In other words, a statute of limitations period will not begin to run until the beneficiary knows or through reasonable investigation could have learned of a breach or repudiation. *See* George Gleason Bogert and George Taylor Bogert, *Trusts & Trustees* § 951 (2d ed.1995). What is unclear about the rule of the *Acott* and *Walker* cases is whether that rule is a special statute of limitations rule for trusts, or merely a part of what we now term the "discovery rule." Although we have never explicitly so stated, we now conclude that this special "trust" statute of limitations rule is a version of the discovery rule. To explain, where a trustee is sued by a beneficiary or claims a violation of the trust, it constitutes an "exceptional circumstance" calling for application of the discovery rule. We have held that under certain "exceptional circumstances" we will find that a rigid application of the statute of limitations may be "irrational and unjust," and thus make the discovery rule available. *Warren v. Provo City Corp.,* 838 P.2d 1125, 1129 (Utah 1992). To determine when this is the case, we apply a balancing test to weigh "the hardship imposed on the claimant by the application of the statute of limitations against any prejudice to the defendant resulting from the passage of time." *Sevy v. Security Title Co.,* 902 P.2d 629, 636 (Utah 1995) (citing *Myers,* 635 P.2d at 87). In the category of cases involving beneficiaries' claims of trustee misconduct, we have, in effect, already conducted this balancing test.

In *Acott* and *Walker* we found, in substance, that to not apply the discovery rule would lead to unjust results because of the close familial relationship involved. *See Acott,* 9 Utah 2d 71, 337 P.2d at 724; *Walker,* 17 Utah 2d 53, 404 P.2d at 257. In such a situation, the beneficiary will be less likely to question the motives of the trustee and less likely to sue. *See Walker,* 404 P.2d at 257. Therefore, it is appropriate to protect the interests of a beneficiary by applying the discovery rule to toll the statute of limitations until the beneficiary knows or should know of the alleged breach or repudiation.

¶ 12 We now address how the discovery rule applies to the facts before us. The issue Gloria presents on appeal is whether the trial court should have granted her summary judgment motion, finding that, as a matter of law, Lynda knew or had reason to know of the accrual of a cause of action more than four years before she filed suit. In addressing this issue, we consider the facts in a light most favorable to Lynda, the non-moving party. *See Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 399 (Utah 1998). In the December, 1984 meeting with her father, Gloria, and Mr. Gamble, Lynda heard the Glayde V. Snow Trust mentioned, but she did not remember the specifics of the references to it. In March of 1985, Lynda received the package of papers from Mr. Gamble, some of which referred to the transfer of the home from her mother and father to the Glayde V. Snow Trust, and subsequent transfers to her sister. She later recalled that in receiving these documents, she was confused about the nature of this trust. She confronted her father about the trust, because he was the named trustee in the documents. According to her testimony, she never asked anyone for a copy of the trust document and never took any steps to get the document until after Dr. Snow's death. After her father's death, Lynda approached Judge Jeppson, who her mother, almost twenty years before, had told her was involved in her mother's estate planning, and asked him about the Glayde V. Snow Trust. Judge Jeppson produced the trust document. She stated that she asked for the document because "she wanted to know the history of the

[trust] documentation" and because her mother had told her that the family home was going to her two daughters, and she was concerned that the sale of the home to Gloria was contrary to that wish. Lynda also said in her deposition that she probably had had that concern since she had received the packet of materials mentioning the Glayde V. Snow Trust in 1985. When she was questioned as to why she did not ask Judge Jeppson earlier, she said she was not sure whether he had created the trust. But, after her father's death, she did contact him "on a guess," because he was the only lawyer that her mother had ever mentioned.

¶ 13 Even considering these facts in a light most favorable to Lynda, there can be no doubt that, as a matter of law, she had knowledge as of 1985 of all facts necessary to put her on notice to inquire as to whether the sale of the house to her sister breached the trust. She knew nothing in 1993 that she did not know in 1985, and when she acted on her knowledge in 1993 she quickly gained the trust instrument and all that she needed to file suit. This is a clear case of a plaintiff simply sitting on her rights.

■ ¶ 14 Lynda asserts that even if she was charged with knowledge of the potential breach, the discovery rule should permit the statute to be tolled until she received the trust document because the concealment version of the discovery rule should apply. Lynda claims she was actively misled to not inquire into the nature of the trust and her rights under it. We have held that "in order to invoke the concealment version of the discovery rule it must be shown that given the defendant's actions, a reasonable plaintiff would not have brought suit within the statutory period." *Warren*, 838 P.2d at 1130. Here, because Lynda is suing to enforce her rights as a beneficiary of the Glayde V. Snow Trust, it is proper to bring suit against Gloria; not only for her own alleged concealment, but also, because of her role as successor trustee, for all alleged wrongdoing under the trust. When Lynda approached her father to ask him about the nature of the Glayde V. Snow Trust, he gave her various answers which she interpreted to mean that the trust had been dissolved or at least was not in existence anymore. His claim that the Glayde V. Snow Trust did not exist did not erase her need to inquire into the actual terms of this trust. Even if she was told that this trust did not exist anymore, she was aware that the family home was sold from this trust. If she thought she at least had a part interest in the family home, then she should have at least inquired as to why the family home was owned by the Glayde V. Snow Trust. Lynda never actually asked her father, Gloria, or anyone else to see a copy of the trust document until after her father's death. It is clear that Lynda was not precluded from getting the trust document before her father's death and she was never told by anyone that she could not have the document or that it did not exist. We therefore hold that no concealment took place and the concealment version of the discovery rule did not toll the statute of limitations after the point in March of 1985 when Lynda received the documents of conveyance naming the trust.

■ ¶ 15 Finally, Lynda claims that we cannot decide the statute of limitations issue as a matter of law because there were disputed factual issues that were decided by the jury against Gloria in the special verdict. The answers to this assertion are several. First, it seems clear that when the trial court submitted the special verdict questions purporting to address the statute of limitations issues, it was attempting to protect against having to retry the case should an appellate court find error in the grant of summary judgment against Gloria on this issue. However, this attempt miscarried because the special verdicts are not phrased in terms appropriate to the applicable legal standard. In the special verdict, the jury decided that prior to Dr. Snow's death, Lynda did not "know of her rights under the Intervivos Trust of Glayde V. Snow" nor was she "fully aware of all facts necessary to show that the conveyance of the [family home] to defendant was a violation of plaintiff's rights as a beneficiary of the Intervivos Trust of Glayde V. Snow." However, the standard of knowledge this verdict assumes is necessary, is far higher than what is actually required. As discussed above, all that is needed to toll the statute of limitations is a finding that through reasonable investigation, the plaintiff

could have determined that there was reason to believe there had been a breach of trust. The special verdict was not written with this standard in mind and no instructions were given to the jury on the statute of limitations and discovery rule issues. Therefore, we conclude that the jury did not consider and resolve any factual issues that would establish that the statute of limitations did not begin to run until 1993. Second, even if the court submitted issues to the jury on the premise that some facts were in dispute, those disputed facts are not dispositive here. Our decision today addresses the correctness of the denial of Gloria's motion for summary judgment on the statute of limitations issue, a motion made before trial and one that assumes the facts in a posture most favorable to Lynda. And we find those facts insufficient to warrant the trial court's denial of Gloria's motion.

¶ 16   In conclusion, we hold that as a matter of law, the statute of limitations period of four years had run when Lynda filed her claim. We find the discovery rule does not operate to bar Gloria's assertion of the statute. Lynda had adequate notice to inquire as to the terms of the Glayde V. Snow Trust, which would have led to the discovery of her rights. We deem this notice to have occurred when she received the documents from Mr. Gamble, which mentioned the Glayde V. Snow Trust. The statute of limitations period began in March of 1985 and closed in March of 1989. Since Lynda's claim was filed on January 5, 1994, it is barred.[2]

¶ 17   We, therefore, reverse.

¶ 18   Chief Justice HOWE, Associate Chief Justice DURHAM and Justice RUSSON concur in Justice ZIMMERMAN'S opinion.

¶ 19   Justice STEWART heard the arguments but retired before he could act on the opinion.

2.   Since we reverse on the statute of limitations issue, we do not address any of the other issues

Gloria raised on appeal.