2019 UT App 137

# THE UTAH COURT OF APPEALS

THE ESTATE OF AMY ALLEN PRICE,
Appellee,
*v.*
MICHAEL HODKIN, KATHERINE S. HODKIN, AND THE ESTATE OF
VIRGINIA S. ANDERSON,
Appellants.

Opinion
No. 20170279-CA
Filed August 8, 2019

Eighth District Court, Duchesne Department
The Honorable Samuel P. Chiara
No. 130800047

Stephen P. Horvat and Heather M. Sneddon,
Attorneys for Appellants

Vincent C. Rampton, Attorney for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES KATE APPLEBY and DIANA HAGEN concurred.

ORME, Judge:

¶1      Plaintiff Amy Allen Price (Amy)[1] brought an action to quiet title in a property's mineral rights by challenging a deed that had been recorded 47 years earlier. Because Amy and her predecessors unreasonably delayed in bringing suit after obtaining constructive knowledge of the cause of action and because their lack of diligence likely prejudiced the defendants to her quiet title action, we hold that the district court

---

1. As is our practice when parties share a last name, we sometimes refer to them by their first names, with no disrespect intended by the apparent informality.

improperly granted summary judgment in favor of Amy. We thus reverse the summary judgment and remand for further proceedings consistent with this opinion.

BACKGROUND[2]

¶2    The property at issue (the Property) consists of two parcels of land in Duchesne County. It was co-owned by two sisters, Virginia Nutter Price (Virginia) and Catherine Nutter Story (Catherine)[3] (collectively, the Sisters), for more than 20 years.

¶3    In 1945, the Property was conveyed by two separate deeds (the 1945 Deeds) to the Sisters "as joint tenants and not as tenants in common, with full rights of survivorship." Their mother, Katherine F. Nutter (Mother), conveyed the first parcel of land to them. Robert E. Mark (Mark), an attorney who, for decades, represented the Nutter family and its business, the Preston Nutter Corporation (PNC), conveyed the second parcel of land to the Sisters. As there is no record of any conveyance taking place between 1945 and 1966 that would have severed the Sisters' joint tenancy, it would appear that their co-ownership of the Property came to an end in 1966 with Catherine's passing.

2. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified).

3. We are unsure as to the correct spelling of Catherine's given name because documents within the record use various spellings. The 1945 Deeds, the key documents in this case, conveyed a joint tenancy interest in the Property to "Catherine" N. Story. Accordingly, we use that spelling in this opinion.

¶4    Mark served as executor of Catherine's estate. Virginia presented a claim to the estate in the form of a promissory note in favor of Mother that Catherine had signed in 1960 (the Note). The Note was "for the principal sum of $10,000.00 payable six months after [Catherine's] death bearing interest at 6% per annum." It was secured by 210 shares of PNC stock. Virginia succeeded to the Note and its security following Mother's death. And at the time of Catherine's passing, the Note was worth $13,614.99. Because Catherine's estate did not possess sufficient funds to pay the Note, Mark petitioned the district court for authorization to convey Catherine's full "undivided one-half interest" in the Property's surface rights[4] to Virginia in full satisfaction of the debt. This petition (the Petition) stated that in exchange for Catherine's interest in the Property's surface rights, Virginia agreed (1) to pay the estate the difference between the value of Catherine's interest in the Property and the amount owed Virginia on the Note, (2) to return the PNC stock that she had held as security on the Note, and (3) that the conveyance expressly excepted "one-half of all oil and gas and one-half of all other minerals contained in [the Property]." The Petition further indicated that "Virginia N. Price has accepted said offer made to her by [Mark]," and it also bore her signature. Apparently no one at the time questioned whether Catherine's one-half interest in the Property had already passed to Virginia, the surviving joint tenant, upon Catherine's death.

¶5    The court granted the Petition, authorizing Mark to convey Catherine's full interest in the Property's surface rights to Virginia while retaining a half-interest in all oil, gas, and mineral

---

4. The Petition describes the Property as consisting of three—not two—parcels of land in Duchesne County. The history of the third parcel is not apparent from the record, but neither party argues that Catherine's interest in that third parcel differed in any way from that of the remaining two parcels.

rights. Mark executed and recorded a deed reflecting the court's order in late 1966 (the 1966 Deed). In 1968, the court further ordered that the Property's income from "one-half of all oil and gas and one-half of all other minerals" be distributed to Mark as trustee of Catherine's testamentary trust. Katherine S. Hodkin and Virginia S. Anderson[5] (collectively, Defendants)[6] are Catherine's daughters and are the beneficiaries of Catherine's testamentary trust.

¶6     In the years following the 1966 transaction, Virginia made a number of payments to Catherine's trust reflecting its share of proceeds from oil and gas leases on the Property, which payments continued after her death in 1977. Upon her passing, Virginia's husband, Howard Price (Howard), succeeded to her interest in the Property. He later married Amy, who likewise succeeded to his interest in the Property following his death in 1982. There is evidence of Amy making intermittent payments to Defendants for Catherine's estate's portion of the proceeds on oil and gas leases on the Property after Howard's passing.

¶7     In 2013, forty-seven years after the 1966 transaction, Amy initiated the current action seeking to quiet title "in and to the surface and subsurface interests in the [Property]" and "seeking

---

5. Since the initiation of the current litigation, Virginia Anderson and Amy have passed. Their estates have been substituted in their place.

6. The collective term "Defendants" also includes defendant Michael Hodkin. He is presumably the husband of Katherine S. Hodkin, but this is not clear from the record. The record and parties' briefing are also unclear as to the genesis of Michael Hodkin's claim to the Property's mineral rights and as to his relationship to his co-defendants and the Nutter family more generally.

related declaratory and equitable relief." In her subsequent motion for summary judgment, Amy argued that because neither sister had severed the joint tenancy ownership of the Property prior to Catherine's death in 1966, Virginia took full title to the Property—including all mineral rights—by right of survivorship. As a result, "[Catherine]'s estate never received, and therefore could not make disposition of, any rights [in the Property]." And as Howard's successor in interest to the Property, who in turn succeeded to Virginia's original interest, Amy argued that the Property's full mineral rights belonged to her by operation of law. She argued that this defeated Defendants' claims of right, title, or interest in any portion of the Property's mineral rights.

¶8      Defendants opposed the motion for summary judgment on several grounds. Among other things, they argued that the 1966 transaction raised a genuine issue of material fact as to whether the joint tenancy created in 1945 had been severed prior to Catherine's passing in 1966. In support of this argument, Defendants relied on Virginia's and Mark's sophistication as well as their conduct following Catherine's death. Specifically, Virginia served as president and treasurer of PNC for more than two decades. At that time, "PNC was one of the largest cattle ranching operations in the Intermountain West, leasing and owning substantial acres of grazing land with cattle herds . . . in Utah, in Arizona, and in various other locations." In addition to cattle ranching, PNC also leased oil and gas rights to major oil companies. Virginia was knowledgeable about real property transactions and, while she served as its president, PNC became one of the first companies to separate leases for tar sands from ordinary oil leases, thereby achieving additional revenue for PNC. Moreover, Mark was PNC's long-time attorney and grantor of one of the parcels of land that made up the Property. Defendants argued that a person possessing Virginia's business acumen and knowledge of real property transactions, or Mark's legal expertise, would have known that if the Property was

owned in joint tenancy, full title would have passed to Virginia by operation of law following Catherine's death. And because both Virginia and Mark entered into the 1966 transaction under the apparent belief that Catherine's estate owned an "undivided one-half interest" in the Property, Defendants argued that they were entitled to the inference at the summary judgment stage that a severance of the Sisters' joint tenancy had somehow occurred prior to Catherine's death notwithstanding the lack of any documentation substantiating that theory.

¶9 Defendants also argued that even if the joint tenancy had not been severed, the 1966 transaction between Mark and Virginia was sufficient to operate as a conveyance of the Property's mineral rights to Catherine's estate. Additionally, they contended that Amy's suit to quiet title was barred by the doctrines of laches, estoppel, waiver, and res judicata given that Amy and her predecessors in interest had acted in accordance with the 1966 transaction for decades and because she and her predecessors waited 47 years, collectively, to file an action to quiet title.

¶10 The district court granted Amy's motion for summary judgment. The court concluded that because Defendants were unable to present direct evidence of severance of the joint tenancy, it was not severed as a matter of law and Catherine's entire one-half interest in the Property, including its mineral rights, passed to Virginia upon Catherine's death. The court stated that "evidence suggesting [Virginia] possessed strong business acumen in no way eliminates the possibility that she erred or had a lapse of memory" when she entered into the 1966 transaction. "The conclusion that [Virginia] believed in or intended a severance would be purely speculative . . . [as well as] irrelevant without evidence of an act of severance." The court also rejected Defendants' argument that the 1966 transaction and subsequent decades of performance constituted a conveyance of the Property's mineral rights to Catherine's estate. It held that

because Catherine's estate did not possess an interest in the Property with which to bargain, the 1966 transaction did not constitute a binding agreement due to a lack of consideration. It also declined to enforce the agreement on the ground that it was "just as likely" that Virginia was acting under a mistake of fact or law when she entered into the agreement. The court further stated that even if the agreement was enforceable, it did not require Virginia to transfer mineral rights to Catherine's estate. And finally, the court rejected Defendants' other arguments, including those based on estoppel, laches, waiver, and res judicata. Regarding Defendants' laches argument, the court stated that "Defendants [had] provided the Court with no evidence to suggest that [Virginia] or her assigns failed to pursue the action after becoming aware of the facts."

¶11 Following additional filings, the district court entered final judgment in favor of Amy, ordering Defendants to disgorge all proceeds they had received from the Property's mineral rights leases since July 15, 2008. Based on the stipulation of the parties, the amount was set at $18,000. Defendants appeal.

ISSUES AND STANDARDS OF REVIEW

¶12 On appeal, Defendants raise several issues that can be separated into two categories. First, they argue that Amy is barred from bringing the current action to quiet title after the passage of 47 years since the 1966 Deed was executed and recorded, and after the parties' decades-long performance in accordance with the 1966 transaction. In support of this argument, Defendants rely on the doctrines of estoppel, laches, waiver, and res judicata. Second, Defendants challenge the district court's grant of summary judgment in favor of Amy on the basis that Defendants had insufficient evidence to show that the Sisters' joint tenancy had been severed prior to Catherine's death. Among other things, they argue that, at the summary judgment stage, they were entitled to the reasonable inference

that the Sisters' joint tenancy had been severed based on the sophistication of the parties who entered into the 1966 transaction and their behavior being consistent with recognition that a severance had occurred. Because we agree with Defendants that the district court improperly granted summary judgment to Amy in view of Defendants' laches defense and reverse on that basis, we limit our analysis to that issue and do not address Defendants' other arguments.

¶13   "The application of laches to a particular set of facts and circumstances presents a mixed question of law and fact," meaning "we review the trial court's conclusions of law for correctness and will disturb its findings of fact only if they are clearly erroneous." *Veysey v. Nelson*, 2017 UT App 77, ¶ 5, 397 P.3d 846 (quotation simplified).

ANALYSIS

¶14   The equitable doctrine of laches "is based upon the maxim that equity aids the vigilant and not those who slumber on their rights." *Insight Assets, Inc. v. Farias*, 2013 UT 47, ¶ 17, 321 P.3d 1021 (quotation simplified). "It is a negative equitable remedy which deprives one of some right or remedy to which he would otherwise be entitled, because his delay in seeking it has operated to the prejudice of another." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 37, 289 P.3d 502 (quotation simplified). Accordingly, to prevail on a defense of laches, a defendant must show that (1) the plaintiff—and, in appropriate cases, the plaintiff's predecessors—failed to diligently pursue its claim against the defendant and (2) the defendant was injured by the plaintiff's lack of diligence. *See Insight Assets*, 2013 UT 47, ¶ 19; *Horne*, 2012 UT 66, ¶ 29.

¶15   The fact that a plaintiff presents a meritorious claim against a defendant does not preclude the application of the doctrine of laches. *See Horne*, 2012 UT 66, ¶ 37 (rejecting the

argument that "a court's recognition of meritorious claims could defeat a laches defense" because such a conclusion "would be antithetical to the whole point of the doctrine of laches"). Furthermore, because "Utah has abolished any formal distinction between law and equity," "the doctrine of laches may apply in equity, whether or not a statute of limitation also applies and whether or not an applicable statute of limitation has been satisfied."[7] *Veysey v. Nelson*, 2017 UT App 77, ¶ 7, 397 P.3d 846 (quotation simplified).

¶16     Utah courts have regularly considered the applicability of the doctrine of laches in cases concerning interests in real property.[8] *See, e.g.*, *Insight Assets*, 2013 UT 47, ¶ 22 (holding that

---

7. Because laches can apply even when an action's statute of limitations has been satisfied, we need not determine whether Amy's action constitutes a "true" quiet title action that is not subject to a statute of limitations. *See In re Hoopiiaina Trust*, 2006 UT 53, ¶¶ 26–27, 144 P.3d 1129.

8. Utah's jurisprudence is consistent with that of other jurisdictions. *See, e.g.*, *Villa Park Village v. Strickland*, 376 N.E.2d 1047, 1048–49 (Ill. App. Ct. 1978) (listing prior cases in which Illinois courts applied laches to bar quiet title actions); *Knight v. Northpointe Bank*, 832 N.W.2d 439, 444–45 (Mich. Ct. App. 2013) (holding that laches barred the plaintiff from challenging whether the defendant, who had power of attorney for the original property owner, validly transferred land to herself); *Johnson v. Estate of Shelton*, 754 P.2d 828, 831 (Mont. 1988) (holding that defendant's counterclaim to nullify the exchange of quitclaim deeds was barred by laches); *Skaggs v. Conoco, Inc.*, 1998-NMCA-061, ¶ 13, 957 P.2d 526 (holding that laches barred plaintiff's suit to quiet title to mineral leasehold); *Robinson v. Estate of Harris*, 705 S.E.2d 41, 44 (S.C. 2011) (holding that laches

(continued…)

laches barred a lender from asserting an interest in real property); *Walker v. Walker*, 404 P.2d 253, 257 (Utah 1965) (holding that laches did not prevent siblings from asserting an interest in real property against their brother because the siblings were not unreasonable in delaying suit until after the death of their mother); *Gold Mountain Dev., LLC v. Missouri Flat, Ltd.*, 2005 UT App 276U, para. 8 (considering defendant's laches argument in a quiet title action and holding that it did not apply because defendant failed to show a lack of diligence on the plaintiff's part). *But see Sweeney Land Co. v. Kimball*, 786 P.2d 760, 762 (Utah 1990) (holding that laches was inapplicable to an action asserting adverse possession because, in such cases, the court's focus should be on the actions of the adverse possessor); 74 C.J.S. *Quieting Title* § 55, at 51 (2002) ("Laches is also ordinarily not a bar to an action to quiet title based on a forged deed or a forged alteration."). Here, after the passage of 47 years, Amy brought a quiet title action seeking to set aside the 1966 transaction and void the 1966 Deed. The district court rejected Defendants' laches argument on the ground that "Defendants have provided the Court with no evidence to suggest that [Virginia] or her assigns failed to pursue the action after becoming aware of the facts."

¶17   We disagree. This disagreement will require us to also consider whether Defendants were prejudiced by Amy's delay.

## I. Lack of Diligence

¶18   "The length of time that constitutes a lack of diligence depends on the circumstances of each case, because the propriety of refusing a claim is equally predicated upon

---

(…continued)
barred plaintiffs' quiet title action where plaintiffs waited 60 years to challenge grantor's conveyance by deed).

the gravity of the prejudice suffered and the length of the delay." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 28, 238 P.3d 1054 (quotation simplified).

¶19 Amy recognizes "that the state of title to [the Property] was a matter of public record from 194[5] onward." But she argues that Defendants "have come forward with no indication that [Amy] delayed unreasonably after obtaining knowledge of her rights."[9] Amy essentially argues that a finding of a lack of diligence should be limited to a showing that a plaintiff unreasonably delayed after obtaining actual knowledge of a cause of action, rather than constructive knowledge.[10] In support of this argument, Amy cites *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, 289 P.3d 502, which approvingly quoted a New Hampshire Supreme Court decision that stated, "Delay for an unreasonable length of time in bringing the suit *after knowledge of the breach* may be the basis for the equitable defense of laches." *Id.* ¶ 32 (emphasis added) (quoting *Valhouli v. Coulouras*, 142 A.2d 711, 713 (N.H. 1958)). However, the quoted language relied on by Amy is only a

---

9. The record does not reveal the date or circumstances surrounding Amy's realization that the 1945 Deeds conveyed the Property to the Sisters "as joint tenants and not as tenants in common, with full rights of survivorship."

10. Actual knowledge is "[d]irect and clear knowledge, as distinguished from constructive knowledge." *Actual Knowledge*, Black's Law Dictionary 1004 (10th ed. 2014). And constructive knowledge is "[k]nowledge that one using reasonable care or *diligence* should have, and therefore that is attributed by law to a given person." *Constructive Knowledge*, Black's Law Dictionary 1004 (10th ed. 2014) (emphasis added).

portion of the entire quote,[11] which our Supreme Court cited in support of its holding that one of its prior cases should be read to mean that "'harm to the plaintiff' is a factor that works with laches—not within it—to evaluate whether an injunction for restrictive covenant violations or the like is proper." *Id.* ¶ 31. In *Horne*, our Supreme Court was not presented with, nor did it address, the issue of whether the diligence prong of laches was limited to actual knowledge. Moreover, even if the language quoted by Amy were to have precedential value for the issue at hand, the language itself employed the broad term "knowledge" and did not distinguish between actual and constructive knowledge.

¶20    Utah courts have stated that constructive knowledge can trigger the due diligence prong of laches. *See Leggroan v. Zion's Sav. Bank & Trust Co.*, 232 P.2d 746, 749–51 (Utah 1951) (holding that laches barred a trust beneficiary's suit against the trustee for an accounting of the trust assets because the beneficiary

---

11. In its entirety, the quoted language reads:

> "Delay for an unreasonable length of time in bringing the suit after knowledge of the breach may be the basis for the equitable defense of laches, particularly where a mandatory injunction is being sought. This is particularly so in view of the further finding that the relative hardship in granting relief to the plaintiffs was disproportionate to the benefit secured thereby. Thus a combination of laches and disproportion between harm and benefit may have the effect of causing the denial of an injunction when neither alone would have caused such denial."

*Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 32, 289 P.3d 502 (quoting *Valhouli v. Coulouras*, 142 A.2d 711, 713 (N.H. 1958)).

unreasonably delayed after obtaining "constructive notice of final distribution"); *Nilson-Newey & Co. v. Utah Res. Int'l*, 905 P.2d 312, 314–15 (Utah Ct. App. 1995) (holding that laches barred plaintiff's action for an accounting and distribution of profits because, in part, plaintiff unreasonably delayed in bringing suit and that although defendants did not formally repudiate their obligation to plaintiff until 1993, plaintiff had constructive knowledge of such repudiation because it knew of a transaction that occurred 25 years earlier from which it never received a distribution of profits). Furthermore, we see no reason why we should not consider constructive knowledge when a defendant raises the doctrine of laches as a defense to a quiet title action when constructive knowledge is otherwise pervasive in Utah property law, particularly in quiet title actions. *See, e.g.*, *Allen v. Hall*, 2005 UT App 23, ¶¶ 10–11, 107 P.3d 85 ("[Defendant] is deemed to have had notice of [plaintiff's] interest from the time of recording . . . . [Defendant's] notice of [plaintiff's] interest destroys any equitable ground upon which the court could quiet title in [defendant]."), *aff'd in part, rev'd in part*, 2006 UT 70, 148 P.3d 939. *See also* Utah Code Ann. § 57-3-102(1) (LexisNexis 2010) ("Each document [properly] executed, acknowledged, and certified . . . shall, from the time of recording with the appropriate county recorder, impart notice to all persons of their contents.").

¶21 Here, the 1945 Deeds unambiguously stated that the Property was conveyed to the Sisters "as joint tenants and not as tenants in common, with full rights of survivorship," and, as part of the public record, the 1945 Deeds were readily available for review long before the 1966 transaction and recordation of the 1966 Deed. Amy succeeded to Virginia's interest in the Property in 1982, upon Howard's passing. But Amy did not bring the present quiet title action until 2013—31 years after she inherited the Property or an interest in it. Likewise, even assuming that Virginia and Mark entered into the 1966 transaction under the mistaken belief that the Sisters were

granted the Property as tenants in common and not joint tenants, Amy and her predecessors in interest had constructive knowledge of this mistake for 47 years before Amy initiated the current action. As such, Amy and her predecessors certainly cannot be characterized as "vigilant." *See Insight Assets, Inc. v. Farias*, 2013 UT 47, ¶ 17, 321 P.3d 1021 ("Equity aids the vigilant and not those who slumber on their rights.") (quotation simplified). And because Amy has not identified a circumstance that would excuse the 47-year delay, that delay surely appears to be unreasonable. *See Nilson-Newey*, 905 P.2d at 315 (stating that the plaintiff's failure to act for 25 years after obtaining constructive knowledge was unreasonable "unless the delay [was] excused by some other circumstance").

¶22    Amy next argues that because "[Defendants] were on record, constructive notice—just as much as [she] was—as to who owned mineral rights in [the Property] and who did not," they were equally "derelict in failing to seek clarification by the court." Amy is correct that Defendants also had constructive notice of the Sisters' joint tenancy in the Property, at least initially, but Defendants did not have the same duty as Amy to bring a timely action to quiet title in the mineral rights. This is because

> a property owner who has record notice of possible problems with the owner's title may, but is not required to, bring an action to eliminate those problems. When a property interest is actually repudiated or challenged, or an adverse claim is asserted against that interest, the property owner is obligated to act within a reasonable time to protect the owner's interests. In the face of such a challenge, an action unreasonably delayed is time barred, because to allow it would result in injury, prejudice or disadvantage to the party against whom the action is brought.

*Association of Unit Owners of the Inn at Otter Crest v. Far West Fed. Bank*, 852 P.2d 218, 222 (Or. Ct. App. 1993) (quotation simplified). *See* 74 C.J.S. *Quieting Title* § 55, at 50 (2002) ("A plaintiff in possession under a claim of title is entitled to wait until possession is invaded or the title attacked before taking steps to vindicate it, and a mere lapse of time will not bar the action."). *Cf. In re Hoopiiaina Trust*, 2006 UT 53, ¶ 26, 144 P.3d 1129 (stating that "true" quiet title actions, which the Court defined as those "brought to quiet an *existing* title against an adverse or hostile claim of another," are "not subject to a statute of limitations") (emphasis in original) (quotation otherwise simplified).

¶23 Here, Defendants own half of the Property's mineral rights under color of title by virtue of the 1966 Deed. They have also long benefitted from their share of the mineral rights as they collected rents attributable to their portion of the mineral leases. For that reason, they were under no obligation to bring an action to quiet title before their interest in the mineral rights was actually challenged. So laches may be asserted against Amy, but it cannot be claimed against Defendants absent a showing that they unreasonably delayed *after* their interest was challenged, which showing Amy has not made.

¶24 For these reasons, it appears that Amy failed to exercise due diligence in asserting her interest in the other half of the Property's mineral rights because she and her predecessors unreasonably delayed by waiting 47 years to bring an action to quiet title.

## II. Injury to Defendants

¶25 Once a defendant has established a lack of diligence on the part of the plaintiff, the defendant, to prevail on the laches defense, must show that the lack of diligence resulted in an injury to the defendant. *See Insight Assets, Inc. v. Farias*, 2013 UT 47, ¶ 19, 321 P.3d 1021. "[U]navailable or long-lost evidence and

witnesses" have "long [been] recognized" as injuries that the doctrine of laches is intended to prevent. *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 38, 289 P.3d 502. *See Young v. Western Piling & Sheeting*, 680 P.2d 394, 395 (Utah 1984); *Leggroan v. Zion's Sav. Bank & Trust Co.*, 232 P.2d 746, 750 (Utah 1951); 12A C.J.S. *Cancellation of Instruments* § 112, at 582 (2004) ("Laches may be a defense where, by reason of the death of the participants or other important witnesses, weakened memories, or the loss or destruction of documents, proof has been lost so that the controversy cannot be determined without the danger of doing injustice.").

¶26    Here, Amy brought an action to quiet title in the Property's mineral rights, which action would require a determination that the 1966 Deed is void. She contends that because the Property was conveyed to the Sisters "as joint tenants and not as tenants in common," Virginia took title to the entire Property by right of survivorship upon Catherine's death. Defendants counter by arguing that based on the sophistication of the parties who entered into the 1966 transaction, it is reasonable to instead infer that a severance of the joint tenancy occurred sometime between 1945 and 1966.

¶27    A brief overview of joint tenancy is helpful to the current analysis. A joint tenancy is "[a] tenancy with two or more coowners who are not spouses on the date of acquisition and have identical interests in a property with the same right of possession." *Joint Tenancy*, Black's Law Dictionary 1694 (10th ed. 2014). It differs from a tenancy in common in that "each joint tenant has a right of survivorship to the other's share." *Id.* A severance of a joint tenancy has the effect of terminating the right of survivorship between the joint tenants. *Crowther v. Mower*, 876 P.2d 876, 879 (Utah Ct. App. 1994). "Either party to a joint tenancy may terminate it and the consent of the other tenants to the severance or termination is not required." *Id.* at 878 (quotation simplified). Prior to 1996, severance of a joint

tenancy was achieved "by destroying one of the four unities essential to joint tenancy—time, title, interest, and possession." *In re Estate of Knickerbocker*, 912 P.2d 969, 974 (Utah 1996). If a joint tenant desired to terminate the joint tenancy without mortgaging or selling his interest to a third party, the joint tenant had to arrange a "'strawman' transaction, in which he would convey his interest to a third party who would immediately convey it back to the grantor." *Id.* Because conveyances of a joint tenant's interest to a third party did not need to be recorded, *Crowther*, 876 P.2d at 878–79, it follows that such "strawman" transactions likewise did not require recordation, *see Knickerbocker*, 912 P.2d at 976 (recognizing the existence of unrecorded strawman transactions by noting that "a recorded strawman transaction . . . is superior to an unrecorded one"). It was in 1996 that our Supreme Court issued *Knickerbocker*, in which it held that "it is the intent of the parties, not the destruction of one of the four unities, that should govern" the severance of joint tenancies. *Id.* at 975. It further dispensed with the requirement of "strawman" transactions in favor of recorded unilateral self-conveyances.[12] *Id.* at 976 ("[A] joint tenant may effectively sever a joint tenancy by executing *and recording* a unilateral self-conveyance.") (emphasis added).

¶28 Undoubtedly referencing the "strawman" transactions that prior to 1996 were the sole means of severing a joint tenancy when it was not intended to actually transfer an interest in the property to a third party, the district court correctly noted that although "the conveyance that effectuates the severance need not be recorded, . . . delivery of a deed severing the joint tenancy by transferring title must be proven." The court cited *Crowther*, 876 P.2d at 878, and *Nelson v. Davis*, 592 P.2d 594, 597 (Utah

---

12. This change in the law also helps prevent future situations similar to those of the current case that arose from a possible unrecorded "strawman" transaction.

1979), in support of its decision. And therein lies the prejudice Defendants have apparently suffered as a result of the lack of due diligence on the part of Amy and her predecessors in interest. Proof of whether a severance occurred has seemingly been lost to history. In the 47 years since the 1966 Deed was recorded, all parties who were involved in the 1966 transaction have died. Virginia passed in 1977, Mark in 1975, and Howard in 1982. And Mark's business records have likewise been lost. It is now impossible to determine whether Virginia and Mark entered into the 1966 transaction based on a mutual mistake about how the Property was actually titled or whether they did so knowing that the Sisters' joint tenancy had been severed through a "strawman" transaction, recordation of which was not required.

¶29   Because all known witnesses and evidence regarding a potential severance of the Sisters' joint tenancy have long since become unavailable, the injury prong of laches appears to be satisfied.

CONCLUSION

¶30   We hold that the district court improperly granted summary judgment in Amy's favor. The 1945 Deeds upon which Amy bases her claim that the entirety of the Property vested in Virginia upon Catherine's death were a matter of public record since the end of World War II, conferring upon Amy and her predecessors in interest constructive notice regarding the Sisters' initial joint tenancy in the Property. As such, Amy and her predecessors appear to have unreasonably delayed by waiting 47 years to challenge the 1966 Deed and transaction. And Defendants seemingly were injured by Amy's lack of diligence because all known witnesses to the Sisters' joint tenancy have long since died and any evidence of severance has been lost.

¶31     We accordingly reverse the summary judgment entered in favor of Amy and remand for further proceedings consistent with this opinion.

———————